## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. <u>13-cv-01723 - JLK</u>

HIGH COUNTRY CONSERVATION ADVOCATES,
WILDEARTH GUARDIANS, and SIERRA CLUB,

      Plaintiffs,

v.

UNITED STATES FOREST SERVICE,
UNITED STATES DEPARTMENT OF AGRICULTURE,
BUREAU OF LAND MANAGEMENT,
UNITED STATES DEPARTMENT OF THE INTERIOR,
DANIEL JIRÓN, in his official capacity as Regional Forester for the U.S. Forest
Service's Rocky Mountain Region,
SCOTT ARMENTROUT, in his official capacity as Supervisor of the Grand Mesa,
Uncompahgre, and Gunnison National Forests, and
HELEN HANKINS, in her official capacity as the Bureau of Land Management's
Colorado State Office Director,

      Defendants, and

ARK LAND COMPANY, INC., and
MOUNTAIN COAL COMPANY, L.L.C.,

      Intervenor-Defendants

_____

### PLAINTIFFS' OPENING BRIEF ON THE MERITS
_____

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................ 3

I.    STATUTORY BACKGROUND ................................................................................ 3

    A.    The National Environmental Policy Act ......................................................... 3

    B.    Legal Framework For Leasing And Exploring For Coal On Forest Service Lands ..................................................................................................... 4

    C.    Forest Service Roadless Area Management ..................................................... 6

II.   FACTUAL BACKGROUND ..................................................................................... 7

    A.    The West Elk Coal Mine And The Lease Modifications ............................... 7

    B.    The Sunset Roadless Area ............................................................................... 9

    C.    The Forest Service's And BLM's Environmental Review And Approval Of The Lease Modifications ......................................................... 10

    D.    The Colorado Roadless Rule ........................................................................ 13

    E.    The Agencies' Approval Of The Sunset Trail Exploration Plan ................ 16

    F.    This Litigation ............................................................................................... 17

STANDARD OF REVIEW ............................................................................................. 17

ARGUMENT ................................................................................................................... 19

I.    HIGH COUNTRY ADVOCATES HAS STANDING ........................................... 19

II.   THE LEASE MODIFICATIONS FEIS VIOLATES NEPA ................................. 21

    A.    The Lease Modifications FEIS Failed To Disclose Impacts To Adjacent Public And Private Lands ............................................................. 21

i

1.      Agencies Must Disclose Indirect And Cumulative Effects ............. 21

B.      The Lease Modifications FEIS Fails To Disclose The Social, Environmental, And Economic Impacts Of The Lease Modifications' Greenhouse Gas Pollution ................................................... 34

1.      NEPA Requires Agencies To Disclose The Potential Impacts of Greenhouse Gas Pollution................................................... 35

2.      NEPA Requires Agencies To Disclose All Impacts, Including Economic and Social Impacts, Of A Proposed Action .................... 37

3.      NEPA Requires Agencies to Explain Opposing Viewpoints........... 38

4.      The Agencies Violated NEPA By Failing To Evaluate The Social,  Economic, and Environmental Costs Of The Lease Modifications' Greenhouse Gas Pollution ....................................... 49

C.      The FEIS's Failure To Analyze Direct Volatile Organic Compound (VOC) Emissions Associated With Methane Venting Violates NEPA.................................................................................................. 49

1.      NEPA Requires Agencies To Disclose Impacts And To Obtain Necessary Information ................................................... 49

2.      The Lease Modifications FEIS Failed To Disclose The Foreseeable Impacts Of VOC Emissions........................................ 51

III.    THE COLORADO ROADLESS RULE FEIS FAILS TO ADEQUATELY ANALYZE IMPACTS OF GREENHOUSE GAS POLLUTION ........................ 56

A.      The Colorado Rule FEIS Failed To Adequately Disclose Greenhouse Gas Pollution From Coal Mine Operation ................................................... 57

B.      The Colorado Rule FEIS Failed To Adequately Disclose Greenhouse Gas Pollution Released From Combustion Of North Fork Valley Coal..... 64

C.      The Colorado Rule FEIS Failed To Address, Acknowledge, Or Respond To An Expert Report On Greenhouse Gas Emissions  ................ 70

IV.     BLM'S APPROVAL OF THE EXPLORATION PLAN VIOLATES NEPA ..... 71

    A.    BLM Violated NEPA By Failing To Take A Hard Look At The
Exploration Plan's Impacts On Recreation ................................................. 72

    B.    BLM Violated NEPA By Failing To Consider A Range Of
Reasonable Alternatives To The Proposed Exploration Plan ..................... 78

        1.    Agencies Must Analyze A Range Of Alternatives In EAs .............. 79

        2.    The Exploration Plan EA Failed To Analyze A Range Of
Reasonable Alternatives.................................................................. 81

CONCLUSION AND REQUEST FOR RELIEF ............................................................. 85

## TABLE OF AUTHORITIES

**Page(s)**

CASES

Ayers v. Espy,
    873 F. Supp. 455 (D. Colo. 1994)...................................................................... 79, 81, 83

Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,
    462 U.S. 87 (1983)....................................................................................... 3, 36

Blue Mountains Biodiversity Project v. Blackwood,
    161 F.3d 1208 (9th Cir. 1998) ............................................................................ 3

Border Power Plant Working Group v. U.S. Department of Energy,
    260 F. Supp. 2d 997 (S.D. Cal. 2003)................................................................ 35

California Wilderness Coal. v. U.S. Department of Energy,
    631 F.3d 1072 (9th Cir. 2011) ........................................................................... 85

Calvert Cliffs' Coordinating Committee, Inc. v. U.S. Atomic Energy Commission,
    449 F.2d 1109 (D.C. Cir. 1971) ......................................................................... 55

Center for Biological Diversity v. National Highway Traffic Safety
    Administration,
    538 F.3d 1172 (9th Cir. 2008) ......................................................... 35, 44, 80, 84

Center for Biological Diversity v. U.S. Forest Service,
    349 F.3d 1157 (9th Cir. 2003) ......................................................... 37, 48, 71

Center for Native Ecosystems v. Salazar,
    795 F. Supp. 2d 1236 (D. Colo. 2011)............................................................... 86

Citizens to Preserve Overton Park, Inc. v. Volpe,
    401 U.S. 402 (1971)........................................................................................ 18

City of Davis v. Coleman,
    521 F.2d 661 (9th Cir. 1975) ............................................................................ 22

Colorado Environmental Coalition v. Dombeck,
    185 F.3d 1162 (10th Cir. 1999) .................................................................. passim

Colorado Environmental Coalition v. Office of Legacy Management,
   819 F. Supp. 2d 1193 (D. Colo. 2011), ...................................................................... 72

Committee to Save Rio Hondo v. Lucero,
   102 F.3d 445 (10th Cir. 1996) ........................................................................... 19, 21

Conner v. Burford,
   848 F.2d 1441 (9th Cir. 1988) ........................................................................... 23, 30

Davis v. Mineta,
   302 F.3d 1104 (10th Cir. 2002) ...............................................................22, 24, 33, 79

Duke Power Co. v. Carolina Environmental. Study Group, Inc.,
   438 U.S. 59 (1978)............................................................................................... 20

Diné Citizens Against Ruining Our Environment v. Klein,
   747 F. Supp. 2d 1234 (D. Colo. 2010)..................................................................passim

Forest Guardians v. Babbitt,
   174 F.3d 1178 (10th Cir. 1999) ............................................................................. 85

Foundation on Economic Trends v. Heckler,
   756 F.2d 143 (D.C. Cir. 1985)................................................................................ 72

Hughes River Watershed Conservancy v. Glickman,
   81 F.3d 437 (4th Cir. 1996) ............................................................................. 36, 48

Hunt v. Washington State Apple Advertising Commission,
   432 U.S. 333 (1977).............................................................................................. 21

Kern v. U.S. Bureau of Land Mangagement,
   284 F.3d 1062 (9th Cir. 2002) .......................................................................... 61, 63

Kootenai Tribe of Idaho v. Veneman,
   313 F.3d 1094 (9th Cir. 2002) ................................................................................ 6

Lands Council v. Powell,
   395 F.3d 1019 (9th Cir. 2005) ............................................................................... 50

Los Alamos Study Group v. U.S. Department of Energy,
   692 F.3d 1057 (10th Cir. 2012) ............................................................................. 75

Massachusetts v. Environmental Protection Agency,
      549 U.S. 497 (2007) ................................................................................................ 35

Mayo Foundation v. Surface Transportation Board,
      472 F.3d 545 (8th Cir. 2006) ................................................................................ 66

Mid States Coalition for Progress v. Surface Transportation Board,
      345 F.3d 520 (8th Cir. 2003) ...........................................................50, 65-66, 67, 68

Montgomery v. Ellis,
      364 F.Supp. 517 (N.D. Ala. 1973) ........................................................................ 50

Morris v. U.S. Nuclear Regulatory Commission,
      598 F.3d 677 (10th Cir. 2010) .............................................................................. 19

Motor Vehicle Manufacturers Association v. State Farm Mutual Auto. Insurance
      Co., 463 U.S. 29 (1983) ................................................................................... 18, 78

North Carolina Alliance for Transportation Reform v. U.S. Department of
      Transportation, 151 F. Supp. 2d 661, 697 (M.D.N.C. 2001)................................. 34

Northern Plains Resources Council, Inc. v. Surface Transportation Board,
      668 F.3d 1067 (9th Cir. 2011) .............................................................................. 22

National Parks & Conservation Association v. Federal Aviation Administration,
      998 F.2d 1523 (10th Cir. 1993) ....................................................................... 73, 78

Natural Resources Defense Council v. U.S. Forest Service,
      421 F.3d 797 (9th Cir. 2005) .......................................................................... 37, 48

Neighbors of Cuddy Mountain v. U.S. Forest Service,
      137 F.3d 1372 (9th Cir. 1998) .............................................................................. 67

New Mexico ex rel. Richardson v. Bureau of Land Management,
      565 F.3d 683 (10th Cir. 2009) ................................................................................ 3

New York v. Nuclear Regulatory Commission,
      681 F.3d 471 (D.C. Cir. 2012) .............................................................................. 67

Olenhouse v. Commodity Credit Corporation,
      42 F.3d 1560 (10th Cir. 1994) .............................................................................. 18

Robertson v. Methow Valley Citizens Council,
    490 U.S. 332 (1989) ............................................................................................. 4, 37, 67

Rocky Mountain Wild v. Vilsack,
    843 F. Supp. 2d 1188 (D. Colo. 2012) ......................................................................... 72

Rocky Mountain Wild v. Vilsack,
    No. 09-CV-01272-WJM, 2013 WL 3233573 (D. Colo. June 26, 2013) .... 18-19, 48, 70

San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife Service,
    657 F. Supp. 2d 1233 (D. Colo. 2009) ......................................................................... 84

San Luis Valley Ecosystem Council v. U.S. Forest Service,
    No. 04-CV-01071 MSK, 2007 WL 1463855 (D. Colo. May 17, 2007) ...................... 73

Save Our Ecosystems v. Clark,
    747 F.2d 1240 (9th Cir. 1984) ............................................................................... 50, 54

Scientists' Institute for Public Information, Inc. v. Atomic Energy Commission,
    481 F.2d 1079 (D.C. Cir. 1973) ...................................................................... 30, 60, 61

Seattle Audubon Society v. Moseley,
    798 F. Supp. 1473 (W.D. Wash. 1992) ........................................................................ 37

Seattle Audubon Soc'y v. Espy,
    998 F.2d 699 (9th Cir. 1993) ....................................................................................... 37

Sierra Club v. Marsh,
    769 F.2d 868 (1st Cir. 1985) ....................................................................................... 63

Sierra Club v. Sigler,
    695 F.2d 957 (5th Cir. 1983) ................................................................................. 36, 60

Sierra Club v. U.S. Department of Energy,
    255 F. Supp. 2d 1177 (D. Colo. 2002) ......................................................................... 63

Sierra Club v. U.S. Department of Energy,
    287 F.3d 1256 (10th Cir. 2002) .............................................................................. 19, 20

South Fork Band Council v. U.S. Department of the Interior,
    588 F.3d 718 (9th Cir. 2009) ....................................................................................... 55

Utah Environmental Congress v. Richmond,
    483 F.3d 1127 (10th Cir. 2007) ...................................................................... 78

Utah Shared Access Alliance v. Carpenter,
    463 F.3d 1125 (10th Cir. 2006) ...................................................................... 18

Utah Shared Access Alliance v. U.S. Forest Service,
    288 F.3d 1205 (10th Cir. 2002) ........................................................................ 3

Utahns for Better Transportation v. U.S. Department of Transportation,
    305 F.3d 1152 (10th Cir. 2002) .................................................................. 4, 22

Western Watersheds Project v. Abbey,
    719 F.3d 1035 (9th Cir. 2013) ........................................................................ 79

WildEarth Guardians v. Jewell,
    738 F.3d 298 (D.C. Cir. 2013) .................................................................. 20, 45

WildEarth Guardians v. U.S. Forest Service,
    828 F. Supp. 2d 1223 (D. Colo. 2011) ...................................................... 20, 45

Wilderness Society v. Wisely,
    524 F. Supp. 2d 1285 (D. Colo. 2007) .................................................. 72, 80, 83

Wyoming v. U.S. Department of Agriculture,
    661 F.3d 1209 (10th Cir. 2011) ........................................................................ 6

## STATUTES & REGULATIONS

5 U.S.C. §§ 702, 704 ........................................................................................ 18

5 U.S.C. § 706(2)(A) .................................................................................. 18, 85

16 U.S.C. §§ 1600-1614 .................................................................................... 6

42 U.S.C. § 4321 ............................................................................................... 3

42 U.S.C. §§ 4321-4370(h) ................................................................................ 3

42 U.S.C. § 4332(2)(C) ..................................................................................... 4

42 U.S.C. § 4332(2)(C) & (E) ......................................................................... 79

36 C.F.R. § 220.7.............................................................................................. 4

36 C.F.R. § 294.22-.29 ................................................................................................... 7

36 C.F.R. § 294.43....................................................................................................... 14

36 C.F.R. § 294.43(c)(1)(ix)..................................................................................... 15, 86

40 C.F.R. § 51.100 (s)(1)............................................................................................. 51

40 C.F.R. § 1500.1(a) ................................................................................................... 3

40 C.F.R. § 1500.1(b) ................................................................................................. 49

40 C.F.R. § 1502.9(b) ............................................................................................. 37, 48

40 C.F.R. § 1502.14.................................................................................................... 79

40 C.F.R. § 1502.16(a) ............................................................................................... 49

40 C.F.R. § 1502.22.................................................................................................... 49

40 C.F.R. § 1502.22(a) ............................................................................................... 50

40 C.F.R. § 1502.22(a) & (b) ..................................................................................... 56

40 C.F.R. § 1502.22(b) ............................................................................................... 50

40 C.F.R. § 1502.23.................................................................................................... 36

40 C.F.R. § 1508.7...................................................................................................... 22

40 C.F.R. § 1508.8...................................................................................................... 22

40 C.F.R. § 1508.8(b) ................................................................................................. 36

40 C.F.R. § 1508.9(a) ................................................................................................... 4

40 C.F.R. § 1508.9(b) .............................................................................................. 4, 79

40 C.F.R. § 1508.13...................................................................................................... 4

40 C.F.R. § 1508.25(c) ............................................................................................... 21

43 C.F.R. § 4.21.......................................................................................................... 13

43 C.F.R. § 46.300........................................................................................................ 4

43 C.F.R. Part 3410 ............................................................................................... 5, 87

43 C.F.R. Part 3410.2-1(c) ....................................................................................... 5

43 C.F.R. § 3432.1................................................................................................... 5

43 C.F.R. § 3432.3 (c) ............................................................................................. 5

43 C.F.R. § 3432.3 (d) ............................................................................................. 5

43 C.F.R. Part 3480 ............................................................................................... 86

43 C.F.R. § 3480.0-6(d)(1) ................................................................................ 83, 85

43 C.F.R. § 3482.2(a)(1)...................................................................................... 6, 83

## Other Authorities

66 Fed. Reg. 3244 (Jan. 12, 2001)............................................................... 6, 13, 15

73 Fed. Reg. 16,436 (Mar. 27, 2008) ..................................................................... 51

73 Fed. Reg. 43,544 (July 25, 2008) ...................................................................... 14

76 Fed. Reg. 21,272 (Apr. 15, 2011)................................................................. 14, 56

77 Fed. Reg. 39,576 (July 3, 2012) .................................................................. 14, 15, 59

77 Fed. Reg. 26,547 (May 4, 2012)......................................................................... 14

77 Fed. Reg. 62,624 (Oct. 15, 2012) ...................................................................... 41

78 Fed. Reg. 36,316 (June 17, 2013)....................................................................... 41

Sarah E. Light, NEPA's Footprint: Information Disclosure as a Quasi-Carbon Tax
    on Agencies, 87 Tul. L. Rev. 511, 545-46 & n.160 (Feb. 2013) ................................ 41

Cass R. Sunstein, The Real World of Cost-Benefit Analysis: Thirty-Six Questions (and
    Almost as Many Answers), 114 Colum. L. Rev. 167, 171-73 (Jan. 2014) ..............................40

## TABLE OF ILLUSTRATIONS

| DESCRIPTION | PAGE# |
|---|---|
| Figure 1 – Vegetative Cover Within The Lease Modifications | Pg. 26 |
| Figure 2 – Excerpt of FEIS Figure 3.30b | Pg. 28 |
| Figure 3 – Arch Coal Mine Layout Map (2010) | Pg. 28 |
| Figure 4 – Forest Service, "Subsidence Under Alternatives 2 and 3" (July 2012) | Pg. 29 |

**INTRODUCTION**

The Sunset Roadless Area is a 5,800 acre area of undeveloped aspen and spruce forests, beaver ponds and streams that hugs the west flank of 12,700-foot Mount Gunnison and the West Elk Wilderness in western Colorado. These roadless lands, managed by the U.S. Forest Service, are home to elk, black bear, and lynx, and are enjoyed by hikers and hunters.

In 2012 and 2013, however, the U.S. Department of Agriculture (USDA), the Forest Service and the Bureau of Land Management (BLM) made three interrelated decisions that will dramatically alter this natural area by giving mining giant Arch Coal the right to bulldoze more than six miles of road and scrape dozens of drill pads there. The first decision approved modifications that expand Arch Coal's existing leases, giving the company the right to mine coal under the roadless area. The second approved a Colorado-specific rule for management of the Forest Service's roadless lands, which contains a loophole allowing road construction for coal mining within 20,000 acres of roadless lands including the Sunset area. The third approved Arch Coal's plan to construct roads and drill pads in the Roadless Area to explore for coal in the company's newly leased lands.

Each of these decisions was enacted in violation of the National Environmental Policy Act (NEPA). In approving the coal lease modifications (Lease Modifications), the Forest Service and BLM (together, "the Agencies") admitted that the leases would enable Arch Coal to mine millions of additional tons of coal <u>outside</u> the Lease Modifications

1

area, but they failed to identify the location of, or the resources damaged by, that additional mining. The Agencies also failed to disclose the social, economic, and ecological impacts of greenhouse gas pollution caused by mining and burning the coal from the Lease Modifications despite the existence of a federal protocol allowing agencies to evaluate just such impacts. And the Agencies failed to disclose the impacts of smog-forming pollutants emitted by mining operations although they had or could have obtained information about such pollution.

The USDA similarly erred in approving the Colorado Roadless Rule by making careful predictions about the economic benefits of mining the additional 347 million tons of coal the Rule makes accessible, but turning a blind eye to the air and climate pollution impacts from mining and burning that coal. And in approving Arch Coal's exploration plan, the Agencies failed to analyze impacts to recreational values caused by bulldozing roads and drill pads in the Sunset Roadless Area on the false assumption that no recreation values were present there. The Agencies also failed to consider reasonable alternatives proposed by the Plaintiffs High Country Conservation Advocates[1] et al. (collectively "High Country Advocates") that could have limited damage to the forest.

The Agencies' repeated failures to take the "hard look" at environmental impacts violates NEPA's mandates and must be set aside and remanded.

---

[1] Until March 2014, Plaintiff High Country Conservation Advocates was "High Country Citizens Alliance."

## STATEMENT OF FACTS

**I.      STATUTORY BACKGROUND**

**A.      The National Environmental Policy Act**

NEPA is the "basic national charter for protection of the environment," and the "centerpiece of environmental regulation in the United States."  42 U.S.C. §§ 4321-4370(h); New Mexico ex rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 703 (10th Cir. 2009) ("centerpiece"); 40 C.F.R. § 1500.1(a) ("charter").  Congress enacted NEPA in part to promote government efforts that "will prevent or eliminate damage to the environment."  42 U.S.C. § 4321.  NEPA requires agencies "to consider every significant aspect of the environmental impact of a proposed action."  Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 97 (1983) (quotations & citation omitted).  "It also ensures that an agency will inform the public that it has considered environmental concerns in its decision-making process."  Utah Shared Access Alliance v. U.S. Forest Serv., 288 F.3d 1205, 1207 (10th Cir. 2002).  The NEPA process guarantees that an agency prepares a "coherent and comprehensive up-front environmental analysis to ensure informed decision making to the end that 'the agency will not act on incomplete information, only to regret its decision after it is too late to correct.'"  Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1216 (9th Cir. 1998) (quoting Marsh v. Or. Natural Res. Council, 490 U.S. 360, 371 (1989)).

NEPA does not, however, mandate a particular result.  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989).

To fulfill its purposes, NEPA requires federal agencies to prepare an environmental impact statement (EIS) before undertaking "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C). An EIS must take a "hard look" at the potential environmental impacts of the proposed action and disseminate its analyses to the public.  Robertson, 490 U.S. at 350; see also Utahns for Better Transp. v. U.S. Dep't of Transp., 305 F.3d 1152, 1163 (10th Cir. 2002) as modified on reh'g, 319 F.3d 1207 (10th Cir. 2003).

When an agency is uncertain whether a federal action may have significant environmental impacts, the agency must prepare an environmental assessment (EA) to determine whether to prepare an EIS.  40 C.F.R. § 1508.9(a); 36 C.F.R. § 220.7; 43 C.F.R. § 46.300.  Although an EA may be more brief than an EIS, the EA must nonetheless disclose, analyze, and take a hard look at the "need for the proposal, … alternatives as required by [NEPA] section 102(2)(E), [and] the environmental impacts of the proposed action and alternatives."  40 C.F.R. § 1508.9(b).  If the agency concludes the action may have significant impacts, it must prepare an EIS.  If it concludes no significant impacts are likely, it may issue a "Finding of No Significant Impact" and forego preparing an EIS.  40 C.F.R. § 1508.13.

4

### B.    Legal Framework For Leasing And Exploring For Coal On Forest Service Lands

Both BLM and the Forest Service have authority over coal leasing and exploration on Forest Service lands.  Where a coal lease holder seeks to modify an existing lease to include additional adjacent lands, the lessee must file an application with BLM, the agency that manages public land minerals.  43 C.F.R. § 3432.1.  Where the coal lease modification area includes land managed by the Forest Service, BLM must submit the application to the Secretary of Agriculture to, among other things, obtain the Forest Service's "consent."  Id. § 3432.3(d).  BLM must prepare an EA or EIS prior to approving a lease modification.  Id. § 3432.3(c).

Coal exploration regulations vary according to whether the land is under lease and whether the land is within a lessee's mine permit boundary.  Where the exploration will take place on lands not under lease, the entity seeking to explore must obtain an exploration license.  See 43 C.F.R. pt. 3410.  These regulations require the publication of a notice of the company's exploration plan, and mandate that other companies have a chance to share in the costs and the data retrieved from such exploration.  Id. § 3410.2-1(c).  However, where the exploration will occur on lands already leased, but not within an approved mine permit boundary, BLM reviews the exploration plan pursuant to 43 C.F.R. Part 3480.  These regulations do not require the applicant to obtain an exploration license, nor must the applicant share data obtained with other interested parties.  Where other federal agencies, such as the Forest Service, manage surface resources on lands

5

where exploration is proposed, BLM is required to engage in "consultation" with the surface managing agency.  Id. § 3482.2(a)(1).  To this end, an exploration plan cannot be approved until the surface managing agency reviews the adequacy of the reclamation bond and "concur[s] with the approval terms of the exploration plan."  Id.

### C.    Forest Service Roadless Area Management

Forest Service lands are generally managed under the agency's organic act, the National Forest Management Act.  See 16 U.S.C. §§ 1600-1614.  That law does not provide specific direction to protect the character of lands undisturbed by roads.  In 2001, the USDA adopted a national rule that generally prohibits the construction of new roads, including temporary roads, within Forest Service lands designated as roadless.  Roadless Area Conservation Rule, 66 Fed. Reg. 3244 (Jan. 12, 2001) (to be codified at 36 C.F.R. pt. 294).[2]  This rule bars the construction of new roads for coal mining on lands leased after January 12, 2001.[3]  Although a number of lawsuits were filed attacking it, the Roadless Area Conservation Rule was upheld by both the Ninth and Tenth Circuits and the Rule is in force today.[4]

---

[2]  The Roadless Rule does not appear in the current edition of the Code of Federal Regulations apparently because the Rule's validity was for a time in question due to a district court decision that was reversed in 2011.  See Wyoming v. U.S. Dep't of Agric., 661 F.3d 1209 (10th Cir. 2011) (upholding Roadless Rule).

[3] "Exploration and development in areas not under lease [for oil, gas, and coal] as of the date of the publication of this rule and requiring roads would be precluded."  66 Fed. Reg. at 3269.

[4]  Wyoming, 661 F.3d at 1220; Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094, 1115-26 (9th Cir. 2002) (setting aside lower court injunction because plaintiffs failed to show a strong likelihood of success on the merits of their claims attacking the Roadless Rule), abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Serv., 630 F.3d 1173 (9th Cir. 2011).  The

6

## II.    FACTUAL BACKGROUND[5]

### A.    The West Elk Coal Mine And The Lease Modifications

The West Elk coal mine (West Elk) is located near Paonia, Colorado, in the North Fork Valley of Gunnison County.  West Elk is an underground mine owned and operated by Mountain Coal Company (MCC), a subsidiary of Arch Coal, Inc., the nation's second largest coal producer.[6]  The mine largely underlies lands managed by the Forest Service within the Grand Mesa, Uncompahgre and Gunnison (GMUG) National Forest.

The geologic formations in and adjacent to the coal seams mined at West Elk contain significant amounts of methane.  Because it is combustible, methane can pose a safety hazard in mines.  To protect miners, Arch Coal removes methane through the mine's ventilation system and through drainage wells which are drilled from the surface above the underground mine.[7]  To drill each well, Arch Coal must first bulldoze a road up

---

Roadless Area Conservation Rule has been superseded by state-specific rules in Idaho and Colorado.  See 36 C.F.R. § 294.22 - .29 (Idaho Rule); infra at 13-15 (addressing Colorado Rule).

[5]  For the Court's convenience, High Country Advocates has provided all record citations and other relevant materials as Exhibits.  We will refer to documents in each administrative record by author, title, date, and page number; by Exhibit number; and by the Bates number for the document in the respective record.  There are four administrative records in this case.  We refer to the Forest Service Lease Modifications record as "FSLeasing-xxxx;" to the BLM's Lease Modifications record as "BLM_mods-xxxx;" to the Exploration Plan record as "BLM_EP-xxxx;" and to the Colorado Roadless Rule record as "CRR-xxxx."  All record documents can be accessed by clicking the hyperlink in the Excel spreadsheet index lodged with the court for each record.

[6]  We generally refer to Arch Coal and its subsidiaries as "Arch Coal."

[7]  Forest Service, Final Environmental Impact Statement, Federal Coal Lease Modifications COC-1362 & COC-67232 (Aug. 2012) ("Lease Mods FEIS") (Ex. 1) at 33 (FSLeasing-46776 at 46830).

to 30 feet or more wide through the forest to a drill site.  There, rough terrain is stripped

of vegetation and leveled to create a flat dirt pad up to one acre in size to accommodate

an industrial drill rig, a mud pit, a structure to vent the methane, and other facilities.[8]

Coal mines in the North Fork Valley typically construct 10-20 drill pads per square mile

to vent methane,[9] creating a network of roads and pads that scar the forest.  Coal mining

at West Elk thus has two obvious direct impacts: (1)  destruction of forest through road

and drill pad construction; and (2) air pollution impacts associated with methane venting.

On January 16, 2009, two Arch Coal subsidiaries applied to BLM to modify two

existing coal leases (COC-1362 and COC-67232) by adding to the leases additional

GMUG National Forest lands and the federal coal beneath them.[10]  The Lease

Modifications would add approximately 1,721 acres total – almost three square miles – to

the two existing leases.[11]  It is estimated that Arch Coal could remove 10.1 million tons

of coal from the Lease Modifications.[12]  Access to the Lease Modifications area would

---

[8]  Id. at 51, 54 (FSLeasing-46848, 46851); see also id. at 52 (FSLeasing-46849) ("Other post-leasing surface activities that could be reasonably anticipated includes: exploration drilling, seismic exploration, ground water monitoring well installation, subsidence and hydrology monitoring sites, and access needed for these facilities."); D. Gray, West Elk photos (July 9, 2012) (Ex. 2) at 29th page (FSLeasing-116848, 116876) (photo of methane drainage well pad and mud pit under construction).

[9]  Letter of E. Zukoski, Earthjustice to Forest Supervisor (July 9, 2012) ("High Country Citizens' Alliance Draft EIS Comments") (Ex. 3) at 44 (FSLeasing-40703 at 40704, 40747) (citing Forest Service EISs).

[10]  Ark Land Co., Application to Modify Federal Coal Leases C-1362 and COC-67232 (Jan. 16, 2009) (Ex. 4) (FSLeasing-8731 at 8734).

[11]  Lease Mods FEIS (Ex. 1) at 13 (FSLeasing-46776 at 46810).

[12]  Id. at 51 (FSLeasing-46848).

8

also allow Arch Coal to access and mine 8.9 million tons of additional coal on adjacent Forest Service and private lands.[13]  In total, the Lease Modifications would allow Arch Coal to mine 19 million tons of coal and extend the Mine's life by about 2.9 years.[14]

### B.    The Sunset Roadless Area

Virtually the entire area covered by the Lease Modifications is located within the Sunset Roadless Area, a 5,800 acre expanse of undeveloped and unroaded forest of aspen and giant spruce located nine miles east of Paonia, and directly adjacent to the West Elk Wilderness Area.[15]  The Sunset Roadless Area is home to elk, mule deer, black bear, wild turkey, northern leopard frog, goshawk, and mountain lion, and provides habitat for the lynx, a species protected as "threatened" under the Endangered Species Act.[16]  Because the Sunset Roadless Area contains remote, undeveloped forest, in 2005 the GMUG National Forest found nearly 3,000 acres of the Sunset Roadless Area "capable" of wilderness protection, including lands within the Lease Modifications.[17]  The roadless area is traversed by the Sunset Trail, after which the area is named, a trail on a bench of

---

[13]  Id.

[14]  Id. at 190 (FSLeasing-46987).

[15]  See id. at 3, 479 (FSLeasing-46800, 47275).

[16]  Id. at 126-31, 136-39, 143-44, 150-51, 166 (FSLeasing-46923-28, 46933-36, 46940-41, 46947-48, 46963).

[17]  Sunset Roadless Evaluation, Appendix D to Lease Mods FEIS (Ex. 1) at 479-80 (FSLeasing-46776 at 47275-76).

forest, meadows and beaver ponds on the western flank of Mount Gunnison, the summit of which is in the wilderness area.[18]

If the Lease Modifications' coal is mined, 1,700 acres of the 5,800-acre Sunset Roadless Area would be criss-crossed by 6.5 miles of roads and 48 methane drainage wells (about 16 wells per square mile, or one every 35 acres).[19]  An additional 42 acres of well pads may be required to mine the adjacent public and private lands coal made accessible by the Lease Modifications.[20]  Damage to the area would be profound: the U.S. Fish and Wildlife Service concluded that habitat cleared for roads and drill pads may not recover its "functionality" for some wildlife for 30-40 years after the roads and well pads are decommissioned.[21]

### C.    The Forest Service's And BLM's Environmental Review And Approval Of The Lease Modifications

In response to Arch Coal's Lease Modifications applications, the Agencies initiated the NEPA environmental review process.[22]  In November 2011, the Forest

---

[18]  See U.S. Geologic Survey, Minnesota Pass Quadrangle (1979), attached as Ex. 24 to letter of E. Zukoski, Earthjustice to C. Richmond, Forest Service (May 20, 2010) (Ex. 5) (FSLeasing-111101 at 111102, 111517) (showing Sunset Trail); Lease Mods FEIS (Ex. 1) at 171 (FSLeasing-46776 at 46968) (showing wilderness boundary).

[19]  Lease Mods FEIS (Ex. 1) at 53-54 (FSLeasing-46776 at 46850-51).

[20]  Id. at 92 (FSLeasing-46776 at 46889).

[21]  Letter of A. Pfister, FWS to C. Richmond, GMUG NF (June 16, 2010) (Ex. 6) at 3 (FSLeasing-117713, 117715) ("lynx habitat may recover to year-round functionality approximately 30-40 years post disturbance").

[22]  Forest Service, Opportunity to Comment, Modifications to Federal Coal Leases COC-1362 and COC-67232 (Apr. 14, 2010) ("FS Scoping Notice") (Ex. 7) (FSLeasing-70123;

10

Service issued an EA and decision consenting to the Lease Modifications, which concluded that the Lease Modifications would have "no significant impact" on the Sunset Roadless Area and the forests and wildlife found there.[23]  Plaintiffs High Country Advovates, among others, filed an administrative appeal of the decision to the Regional Forester pursuant to 36 C.F.R. § 215.[24]  The Regional Forester's office granted the appeal in February 2012, remanding the decision to the GMUG National Forest.[25]

On remand, the Agencies issued a Draft EIS in May 2012 purporting to analyze the Lease Modifications' impacts.[26]  BLM also issued its own "preliminary" EA that incorporated large portions of the Draft EIS.[27]  High Country Advocates commented on the Draft EIS and preliminary EA, alleging, inter alia, that those NEPA documents failed

---

BLM_mods-7).  BLM was a "cooperating agency" assisting in the EIS's preparation.  See id. at 2 (FSLeasing-70124; BLM_mods-8); Lease Mods FEIS (Ex. 1) at 5 (FSLeasing-46776 at 46802).

[23]  Forest Service, Environmental Assessment, Federal Coal Lease Modifications COC-1362 & COC-67232 (Nov. 2011) ("FS Lease Mods EA") (Ex. 8) (FSLeasing-41789); Forest Service, Decision Notice and Finding of No Significant Impact, Federal Coal Lease Modifications COC-1362 & COC-67232 (Nov. 8, 2011) ("Lease Mods FONSI") (Ex. 9) (FSLeasing-41611).  BLM was a cooperating agency on the EA.  See FS Lease Mods EA (Ex. 8) at i (FSLeasing-41789 at 41791).

[24]  WildEarth Guardians et al., Appellants' Statement Of Reasons And Request For Relief (Dec. 30, 2011) ("High Country Citizens' Alliance 2011 Forest Appeal") (Ex. 10) (FSLeasing-129803).

[25]  See Letter of B. Ferebee, Forest Service to E. Zukoski, Earthjustice (Feb. 13, 2012) (Ex. 11) (FSLeasing-131054 at 131056-60).

[26]  Forest Service, Draft Environmental Impact Statement, Federal Coal Lease Modifications COC-1362 & COC-67232 (May 2012) ("Lease Mods Draft EIS") (Ex. 12) (FSLeasing-9871).

[27]  BLM, Environmental Assessment for the West Elk Coal Lease Modifications Application, DOI-BLM-CO-150-2012-13-EA (June 2012) ("BLM Preliminary EA") (Ex. 13) (BLM_mods-7213).

11

to take the requisite "hard look" at many of the Lease Modifications' impacts.[28]  The

Agencies received tens of thousands of comments on the proposed action.[29]

On August 2, 2012, only 24 days after the close of the comment period on the

Draft EIS, the Agencies rushed out the Lease Modifications' Final EIS (FEIS) and a

Record of Decision (ROD).[30]  The ROD approved "Alternative 3" from the Final EIS,

consenting to both Lease Modifications.[31]  BLM never issued a separate final EA.

On September 24, 2012, High Country Advocates and others filed with the Forest

Service an administrative appeal challenging the Lease Modifications ROD, which the

Forest Service denied on November 6, 2012.[32]  The Forest Service then gave BLM its

---

[28]  High Country Citizens' Alliance Draft EIS Comments (Ex. 3) (FSLeasing-40703 at 40704); letter of E. Zukoski, Earthjustice to B. Sharrow, BLM (July 9, 2012) ("High Country Citizens' Alliance Preliminary EA Comments") (Ex. 14) (BLM_mods-161).

[29]  Lease Mods FEIS (Ex. 1) at iii (FSLeasing-46780) (noting that "[a]pproximately 24,680 comment letters were received on the Draft EIS").

[30]  Lease Mods FEIS (Ex. 1) (FSLeasing-46776); Forest Service, Record of Decision, Federal Coal Lease Modifications COC-1362 & COC-67232 (Aug. 2, 2012) ("Forest Service Lease Mods ROD") (Ex. 15) (FSLeasing-69890).

[31]  Forest Service Lease Mods ROD (Ex. 15) at 4 (FSLeasing-69890 at 69893).

[32]  WildEarth Guardians et al., Appellants' Statement Of Reasons And Request For Relief (Sep. 24, 2012) ("High Country Citizens' Alliance 2012 Forest Appeal") (Ex. 16) (FSLeasing-131215 at 131216); letter of B. Ferebee, Forest Service to E. Zukowski [sic], Earthjustice (Nov. 7, 2012) (Ex. 17) (FSLeasing-65326 at 65327).

12

official consent to the Lease Modifications.[33]  BLM issued its own ROD approving the

Lease Modifications on December 27, 2012 relying on the Final EIS's analysis.[34]

On January 28, 2013, High Country Advocates and others appealed the BLM's

approval of the Lease Modifications to the Interior Board of Land Appeals (IBLA)

pursuant to 43 C.F.R. §§ 4.21 and 4.410-4.413.[35]  High Country Advocates timely sought

a stay of BLM's decision, which automatically resulted in a 45-day stay.  See 43 C.F.R.

§ 4.21.  When the IBLA did not act on High Country Advocates' motion within 45 days,

the automatic stay expired.  BLM signed the Lease Modifications on March 26, 2013,

which allowed Arch Coal to move forward with actions to exploit the leased coal.[36]

### D.    The Colorado Roadless Rule

Because the Forest Service identified inventoried roadless lands within the Lease

Modifications area, the 2001 national Roadless Area Conservation Rule prohibited road

construction for coal mining there.  66 Fed. Reg. at 3269; see supra at 6 n.3.  However,

less than a month before the Forest Service issued its Lease Modifications ROD, the

---

[33]  Letter of T. McClure, Forest Service to K. Barton, BLM (Dec. 5, 2012) (Ex. 18) (FSLeasing-65402 at 65403).

[34]  BLM, Record of Decision, Federal Coal Lease Modifications COC-1362 & COC-67232 (Dec. 27, 2012) ("BLM Lease Mods ROD") (Ex. 19) (BLM_mods-9817).

[35]  High Country Citizens' Alliance et al., Notice of Appeal and Petition for Stay (Jan. 28, 2013) (Ex. 20) (BLM_mods-9853).

[36]  BLM, Modified Coal Lease COC-1362 (Mar. 26, 2013) (Ex. 21) at 3 (BLM_mods-11064 at 11066); BLM, Modified Coal Lease COC-67232 (Mar. 26, 2013) at 3 (Ex. 22) (BLM_mods-11074 at 11076).  High Country Citizens subsequently moved for, and was granted, a voluntary dismissal of the IBLA appeal so the groups could pursue an action in federal court.  See Order, High Country Citizens' Alliance, et. al., IBLA-2013-78 (April 23, 2013) ("IBLA Order Dismissing Appeal") (Ex. 23) (BLM_mods11601).

USDA completed a multi-year effort to adopt a rule for the management of roadless National Forest lands in Colorado.

In 2006, the State of Colorado petitioned the USDA to promulgate a state-specific rule to supersede the Roadless Area Conservation Rule.[37]  In response, the Forest Service published a proposed rule and draft EIS in July 2008.[38]  After the State of Colorado proposed modifying its petition in 2010, the Forest Service issued a revised draft EIS in April 2011.[39]  High Country Advocates commented on that EIS, noting, inter alia, that the Forest Service failed to address the air and climate pollution impacts of the proposed rule's loophole that would pave the way for mining and burning hundreds of millions of tons of coal.[40]  The Forest Service issued its final EIS on the Colorado Rule on May 4, 2012.[41]  The USDA adopted the Colorado Roadless Rule on July 3, 2012.[42]

---

[37]  See Notice of Proposed Rulemaking, 76 Fed. Reg. 21,272, 21,273 (Apr. 15, 2011) (CRR-127220 at 127221).

[38]  73 Fed. Reg. 43,544 (July 25, 2008) (CRR-105216).

[39]  76 Fed. Reg. 21,272 (CRR-127220).

[40]  Letter of E. Zukoski, Earthjustice to Colorado Roadless Rule/EIS (July 14, 2011) ("WildEarth Guardians and Sierra Club Comments on Colorado Rule Revised Draft EIS") (Ex. 24) (CRR-133815); letter of Rocky Smith, Rocky Mountain Wild et al. to Colorado Roadless Rule/EIS (July 13, 2011) (Ex. 25) (CRR-134856 at 135023) (comments on revised draft EIS on behalf of High County Citizens, WildEarth Guardians, and others); see also letter of Matt Reed, High Country Citizens' Alliance to Colorado Roadless Rule/EIS (July 14, 2011) (Ex. 26) (CRR-135451 at 135464) (High Country Citizens letter incorporating July 13, 2011 Rocky Mountain Wild comments).

[41]  Forest Service, Final Environmental Impact Statement, Rulemaking for Colorado Roadless Areas Vol. II (May 2012) ("CRR FEIS") (Ex. 27) (CRR-154023); Notice of Availability of Colorado Rule Final EIS, 77 Fed. Reg. 26,547, 26,548 (May 4, 2012).

[42]  77 Fed. Reg. 39,576, 39,576 (July 3, 2012) (CRR-160281); 36 C.F.R. § 294.43.

The Colorado Rule provides weaker protection for roadless areas than the national Roadless Area Conservation Rule.  The national Rule prohibits road construction except for a narrow set of actions, not including new mineral leases.  See 66 Fed. Reg. at 3272-73 (36 C.F.R. § 294.12); supra at 6 n.13.  By contrast, the Colorado Rule allows construction of new "temporary" roads for coal mining within the 20,000-acre "North Fork coal mining area," which includes the Sunset Roadless Area.  36 C.F.R. § 294.43(c)(1)(ix).[43]  In fact, the USDA identified one purpose of adopting the Colorado Rule as "[f]acilitating exploration and development of coal resources in the North Fork coal mining area."  77 Fed. Reg. at 39,576.  The Colorado Rule FEIS acknowledged that the exception for "temporary" roads for coal exploration and mining could allow for the mining (and combustion) of hundreds of millions of tons of coal that would be inaccessible under the national Roadless Rule.[44]

---

[43]  36 C.F.R. § 294.43(c)(1)(ix) provides that "a road or temporary road may only be constructed or reconstructed in Colorado Roadless Areas … if the responsible official determines … [t]hat …[inter alia] [a] temporary road is needed for coal exploration and/or coal-related surface activities for certain lands within Colorado Roadless Areas in the North Fork coal mining area …."  See also Map 9, Rulemaking for Colorado Roadless Areas – North Fork Coal Mining Area: Alternatives 2 & 4 (Ex. 28) (CRR-154494).

[44]  See Table 3-9, CRR FEIS at 80-81 (Ex. 27) (CRR-154023 at 154112-13) (showing an additional 347 million tons recoverable under the Agencies' preferred Alternative 2 compared to Alternative 1, the Roadless Area Conservation Rule).

**E.    The Agencies' Approval Of The Sunset Trail Exploration Plan**

On March 21, 2013, the day Arch Coal signed the Lease Modifications,[45] it also submitted plan to explore for coal on lands within the Lease Modifications area which overlap with the Sunset Roadless Area.[46]  The plan proposed the construction of 5.9 miles of road and 10 drilling pads within the Sunset Roadless Area to assist Arch in "characterization" of the Lease Modifications area's coal resources.[47]  Because the proposed exploration would take place in an area newly added to Arch Coal's leases, Arch Coal could submit an "exploration plan" pursuant to 43 C.F.R. Part 3480, as opposed to an application for an "exploration license" for unleased land under 43 C.F.R. Part 3410.  High Country Advocates submitted timely comments on the Exploration Plan, and suggested several alternatives to protect values, including recreation, within the roadless area.[48]

On June 27, 2013, BLM issued a final EA (without providing the public an opportunity to comment on a draft EA) Finding of No Significant Impact (FONSI), and

---

[45]  BLM, Modified Coal Lease COC-1362 (Mar. 26, 2013) (Ex. 21) at 3 (BLM_mods-11064 at 11066) (indicating MCC signature on Mar. 21, 2013); BLM, Modified Coal Lease COC-67232 (Mar. 26, 2013) at 3 (Ex. 22) (BLM_mods-11074 at 11076) (same).

[46]  Letter of W. Koontz, Ark Land Co. to C. Beecham, BLM (Mar. 21, 2013) ("Arch Coal Exploration Plan") (Ex. 29) (BLM_EP-25 at 26).

[47]  Id. at 1 (BLM_EP-25 at 25).

[48]  Letter of E. Zukoski, Earthjustice to B. Sharrow, BLM (Apr. 19, 2013) ("High Country Citizens Exploration Plan Comments") (Ex. 30) (BLM_EP-469 at 470-603).

16

Decision Record approving the Exploration Plan.[49]  That same day, the Forest Service sent a letter to BLM concurring with the Exploration Plan.[50]

### F.    This Litigation

On June 28, 2013, one day after BLM signed the decision approving the Exploration Plan, BLM petitioned the Interior Board of Land Appeals to put that decision into "full force and effect," which would have allowed Arch Coal to immediately begin exploration construction.[51]  Facing the sudden likelihood that construction within the Sunset Roadless Area could begin within days, High Country Advocates promptly filed this suit and moved for a temporary restraining order (TRO) to halt such construction.[52] After a TRO hearing was scheduled, the IBLA denied BLM's full force and effect petition.  Arch Coal then agreed to not implement the Exploration Plan until June 2014.[53]

### STANDARD OF REVIEW

Because neither NEPA, nor any law or regulation at issue in this case, includes a citizen suit provision, a plaintiff may challenge final agency action in violation of these

---

[49]  BLM, Environmental Assessment, Sunset Trail Area Coal Exploration Plan, DOI-BLM-CO-S050-2013-0027 EA (June 2013) ("Exploration Plan EA") (Ex. 31) (BLM_EP-16168); BLM, Finding of No Significant Impact, DOI-BLM-CO-S050-2013-0027 EA (June 27, 2013) (Ex. 32) (BLM_EP-16216); BLM, Decision Record, DOI-BLM-CO-S050-2013-0027 EA (June 27, 2013) (Ex. 33) (BLM_EP-16219).

[50]  Letter of S. Armentrout, Forest Service to B. Sharrow, BLM (June 27, 2013) (Ex. 34) (BLM_EP-467).

[51]  BLM, Motion to Docket Case And Make Decision Full Force And Effect, DOI-BLM-CO-S050-2013-0027 EA (July 1, 2013) (Ex. 35), Dkt. #12.8 (July 5, 2013).

[52]  See Complaint, Dkt. # 2 (July 2, 2013); Motion For Temporary Restraining Order And Preliminary Injunction, Dkt. #11 (July 5, 2013).

[53]  See Stipulation, Dkt. #27 (July 24, 2013).

laws pursuant to the Administrative Procedure Act (APA).  See 5 U.S.C. §§ 702, 704;

Utah Shared Access Alliance v. Carpenter, 463 F.3d 1125, 1134 (10th Cir. 2006).  This

Court must determine whether the agencies' actions were "arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  In doing

so, it must undertake a "thorough, probing, in-depth review" to determine whether their

decisions were "based on a consideration of the relevant factors and whether there has

been a clear error of judgment."  Citizens to Preserve Overton Park, Inc. v. Volpe, 401

U.S. 402, 415, 416 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S.

99, 105 (1977).  An agency's action must be set aside if it:

> relied on factors which Congress had not intended it to consider, entirely
> failed to consider an important aspect of the problem, offered an
> explanation for its decision that runs counter to the evidence before the
> agency, or is so implausible that it could not be ascribed to a difference in
> view or the product of agency expertise.

Colo. Envtl. Coal. v. Dombeck, 185 F.3d 1162, 1167 (10th Cir. 1999) (quotations and

citation omitted); see also Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1574

(10th Cir. 1994) (same, quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.

Co., 463 U.S. 29, 43 (1983)).  "In addition to requiring a reasoned basis for agency

action, the 'arbitrary or capricious' standard requires an agency's action to be supported

by the facts in the record."  Olenhouse, 42 F.3d at 1575.  An agency's decision is thus

arbitrary if not supported by "substantial evidence."  Id.  Further, "a court cannot defer

when there is no analysis to defer to, and a court cannot accept at face value an agency's

unsupported conclusions."  Rocky Mountain Wild v. Vilsack, No. 09-CV-01272-WJM,

18

2013 WL 3233573, at *3 n.3 (D. Colo. June 26, 2013).  The burden of proof rests with the parties who challenge agency action under the APA.  Morris v. U.S. Nuclear Regulatory Comm'n, 598 F.3d 677, 691 (10th Cir. 2010).

## ARGUMENT

## I.    HIGH COUNTRY ADVOCATES HAS STANDING.

High Country Advocates has standing to bring the claims pressed here.  Article III standing requires "1) 'an injury in fact' that is 2) fairly traceable to the challenged action and 3) likely to be redressed by judicial intervention."  Sierra Club v. U.S. Dep't of Energy, 287 F.3d 1256, 1264-65 (10th Cir. 2002) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).  High Country Advocates meets each part of this test.  The attached declarations of Mr. Nichols, Mr. Reed, and Ms. Melton demonstrate that each plaintiff group has members who use and enjoy the lands within the Lease Modifications area and that their recreational, aesthetic, and health interests will be harmed by bulldozing for road and pad clearing, as well as emissions of volatile organic compounds and other air pollutants emitted during construction and operation of the proposed project.[54]  That harm is a direct result of the inadequate agency analyses challenged here which, together, authorize construction within roadless national forest and prolong the mine's life by nearly three years.  See Comm. to Save Rio Hondo v. Lucero, 102 F.3d 445, 452 (10th Cir. 1996) ("Under [NEPA], an injury results not from

---

[54]  See Declaration of Jeremy Nichols (Mar. 19, 2014) (Ex. 36); Declaration of Allison N. Melton (Mar. 19, 2014) (Ex. 37); and Declaration of Matt Reed (Mar. 19, 2014) (Ex. 38).

the agency's decision, but from the agency's <u>uninformed</u> decisionmaking."). A favorable decision will set aside agency decisions authorizing such damaging actions until the agencies appropriately evaluate environmental impacts. That is sufficient to satisfy the redressability requirement. <u>See, e.g.</u>, <u>Sierra Club</u>, 287 F.3d at 1265-66.

Plaintiffs rely on their aesthetic, recreational, and health injuries for all of their NEPA arguments, including those related to the agencies' inadequate consideration of climate impacts. As the Supreme Court has held, and the D.C. Circuit Court recently affirmed, the injury relied on for Article III standing need not be substantively connected to the merits of a plaintiff's argument. <u>Duke Power Co. v. Carolina Envtl. Study Grp., Inc.</u>, 438 U.S. 59, 78-79 (1978); <u>WildEarth Guardians v. Jewell</u>, 738 F.3d 298, 304-08 (D.C. Cir. 2013). Indeed, courts have concluded that plaintiffs asserting nearly identical harms from coal leasing demonstrated standing for all NEPA arguments, especially in light of the procedural nature of NEPA claims. <u>See</u> <u>WildEarth Guardians</u>, 738 F.3d at 304-08 (finding WildEarth Guardians' members' allegations that they "will be injured by the increase in local air, water and land pollution that will result from [coal] mining" sufficient to demonstrate standing for NEPA arguments concerning climate change caused by subsequent combustion of the coal); <u>WildEarth Guardians v. U.S. Forest Serv.</u>, 828 F. Supp. 2d 1223, 1234-35 (D. Colo. 2011) (reaching the same conclusion regarding challenge to previous the West Elk expansion).[55]

---

[55] High Country Advocates further meet associational and prudential standing requirements. Plaintiffs are nonprofit organizations whose missions include protecting the environment and

## II.    THE LEASE MODIFICATIONS FEIS VIOLATES NEPA

The Lease Modifications FEIS purported to analyze the foreseeable impacts of underground coal mining on the lease, including the construction of nearly 50 drill pads and 6.5-mile road network within the Sunset Roadless Area.  But the FEIS violates NEPA for at least three reasons.  First, the FEIS failed to properly disclose the impacts of coal mining on adjacent private and Forest Service lands, which the Lease Modifications decision makes possible.  Second, the Agencies arbitrarily turned a blind eye to the considerable costs of climate pollution caused by mining and burning the Lease Modifications coal.  Third, the FEIS failed to address the potentially significant impacts of the mine's air pollution that contribute to smog formation.  For each of these reasons, the Agencies' reliance on the FEIS to authorize the Lease Modifications is arbitrary and capricious and must be set aside.

### A.    The Lease Modifications FEIS Failed To Disclose Impacts To Adjacent Public And Private Lands.

#### 1.    Agencies Must Disclose Indirect And Cumulative Effects.

An EIS must analyze three types of impacts of a federal action: direct, indirect, and cumulative.  Colo. Envtl. Coal., 185 F.3d at 1176; 40 C.F.R. § 1508.25(c).  Direct effects "are caused by the action and occur at the same time and place," while indirect

---

public lands in Colorado.  Nichols Decl. ¶¶ 3-5 (Ex. 36), Melton Decl. ¶ 2 (Ex. 37), Reed Decl. ¶ 2 (Ex. 38).  Plaintiffs have associational standing on their members' behalf, including those who use and enjoy the GMUG National Forest and Sunset Roadless Area.  Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977).  Because Plaintiffs seek to protect their members' recreational and aesthetic interests in these places, Plaintiffs' injuries fall squarely within the "zone of interests" NEPA was designed to protect.  Rio Hondo, 102 F.3d at 488.

effects "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable ... [and] may include growth inducing effects."  40 C.F.R. § 1508.8; see also Utahns for Better Transp., 305 F.3d at 1174.  Cumulative impacts are "the impact[s] on the environment which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  40 C.F.R. § 1508.7.

In analyzing indirect impacts, courts have long recognized that reasonably foreseeable effects of private development spurred by the agency action must be disclosed, even where such development will take place solely on private property.  See Davis v. Mineta, 302 F.3d 1104, 1122-23 (10th Cir. 2002) (granting preliminary injunction where agency failed to address growth-inducing impacts of highway project); Sierra Club v. Marsh, 769 F.2d 868, 877-79 (1st Cir. 1985) (holding agency must disclose impacts of private development likely spurred by its decision to build a bridge to undeveloped island); City of Davis v. Coleman, 521 F.2d 661, 674-77 (9th Cir. 1975) (agency must disclose indirect impacts of approving highway interchange, including development, growth, and construction on adjacent private lands).

Further, "reasonable forecasting [and] speculation [are] implicit in NEPA." N. Plains Res. Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067, 1079 (9th Cir. 2011) (quotations and citation omitted).  As the Ninth Circuit stated, "[t]he government's

22

inability to fully ascertain the precise extent of the effects of mineral leasing in a national forest is not, however, a justification for failing to estimate what those effects might be before irrevocably committing to the activity." Conner v. Burford, 848 F.2d 1441, 1450 (9th Cir. 1988).

　　　　　2.　　　The FEIS Failed To Disclose Impacts Of Mining Outside The Lease Modifications Made Possible By Mining Inside.

Here, the Lease Modifications decision will have reasonably foreseeable impacts outside of the four corners of the area added to the leases. The Lease Modifications FEIS admitted: "leasing and development of the lease modifications also allow for the production of 5.6 million tons of fee [private] coal on adjacent lands ... as well as an additional 3.3 million tons from existing adjacent federal coal reserves."[56] The FEIS confirmed that this outside coal would not be mined absent the Lease Modifications decision: "Without the lease modifications, coal on existing federal leases and private lands would be bypassed," meaning it would not be mined, "because of current [coal] panel alignment on parent leases."[57] The Forest Service's ROD predicted that coal mining on adjacent private and federal land made possible by this decision would

---

[56] Lease Mods FEIS (Ex. 1) at 54 (FSLeasing-46776 at 46851)

[57] Id. at 531 (FSLeasing-47327). Owners of the private coal at issue agreed, telling the Forest Service: "If the two federal coal lease modifications are not approved, 977 acres of [private] land will not be mined, bypassing an estimated 5.6 million tons of coal extraction …." See letter of H. Whitman, Mount Gunnison Fuel Co. to Forest Supervisor (May 17, 2012) (Ex. 39) (FSLeasing-10246). See also letter of H. Whitman, Mount Gunnison Fuel Co. to Forest Supervisor (June 26, 2012) (Ex. 40) (FSLeasing-36216) (making similar statement).

lengthen the mine's life by an additional 1.4 years.[58] The FEIS also predicted that extending the mine's life by 2.9 years, 1.4 of which would occur as a result of mining adjacent private and federal lands, will result in "direct economic impacts … [of] approximately $1,075,102,400," assuming the economic value of coal at $40 per ton.[59]

Because the Lease Modifications decision will spur mining on adjacent private and federal lands, NEPA required the Agencies to disclose the impacts of this mining as an indirect impact. See Davis, 302 F.3d at 1122-23.[60] But while FEIS disclosed the precise tonnage and dollar value of coal to be mined outside of the Lease Modifications area, it never disclosed the location and extent of the adjacent private and federal lands to be mined – the most basic and important factors for determining the environmental harm to resources such as wildlife, streams, scenery, and other values.

Specifically, the FEIS failed to contain information necessary to understand where adjacent lands mining will occur: a map displaying, or a description identifying, where the additional coal will be mined or the probable area in which surface impacts from

---

[58] Forest Service Lease Mods ROD (Ex. 15) at 7 (FSLeasing-69890 at 69896) ("The addition of the lease modifications area would add approximately 1.6 years to the permitted baseline on [national forest] lands, and an additional 1.4 years would be added due to probable associated activities on private lands and parent lease COC-1362 which would become accessible under this decision.").

[59] Lease Mods FEIS (Ex. 1) at 190-91 (FSLeasing-46776 at 46987-88).

[60] At a minimum, the Forest Service was required to analyze and disclose the foreseeable impacts of mining on adjacent private and federal land as a cumulative impact.

24

mining may occur.[61]  This failure to disclose where mining impacts will occur outside the

Lease Modifications matters because without understanding where impacts will occur,

neither the public nor the decision maker can understand what values may be impacted.

Each parcel of land is unique.  Impacts from roads and bulldozed methane drainage well

pads will vary by the type of forest, geology, wildlife habitat, slope and hydrology.

Without location data, however, the FEIS cannot disclose whether mining threatens these

resources, and whether synergistic harms to resources both within and outside the Lease

Modifications boundaries (or resources that move across boundaries, like streams and

wildlife) are likely to occur.  Thus neither the reader nor the decisionmaker can

understand the complete scope of the damage the project will cause.[62]

The FEIS's failure to identify the potential location of surface impacts from

mining outside the Lease Modifications stands in contrast to the FEIS maps that identify

the location of, and values within, the Lease Modifications area.  For example, the FEIS

disclosed the "major vegetation cover" that exists within the boundaries of the Lease

Modifications.  See Figure 1, infra at 26.  But the map's depiction of vegetation type

stops dead at the Lease Modifications' boundary.  See id.  While the FEIS thus identified

---

[61]  The FEIS stated only vaguely that the adjacent federal leases from which coal will be mined are somewhere to "the north" of the Lease Modifications, and that the adjacent private land to be mined is to "the west."  Lease Mods FEIS (Ex. 1) at 51 (FSLeasing-46776 at 46848).

[62] Further, impacts of road and methane drainage well pad construction may be greater on private lands because Arch Coal may not be bound by stipulations similar to those limiting harm on public land.  See, e.g., Forest Service Lease Mods ROD (Ex. 15) at 23-36 (stipulations) (FSLeasing-69890 at 69912-15).  Thus, the FEIS could not assume that impacts to private lands will be identical to those within the Lease Modifications.

the values at stake that are likely to be impacted by drill pads and roads <u>within</u> the Lease Modifications area,[63] the reader has no way to determine what habitat values on adjacent private and public land might be impacted by similar development there.



**Figure 1.  Vegetative cover within the Lease Modifications.**[64]

_____

The FEIS's omission of the likely location and values of lands outside the Lease Modifications area is a particularly startling failure to take a "hard look" because the

---

[63]   Lease Mods FEIS (Ex. 1) at 54 (FSLeasing-46776 at 46851).

[64]   Id. at 119, Figure 3.8 (FSLeasing-46776 at 46916).

Forest Service had maps – most buried in the record and not disclosed in the FEIS – that could have enabled the Agencies to predict where mining was likely to happen both within and outside the Lease Modifications.  For example, the Agencies had maps of Arch Coal's "projected" layout of coal mining in and adjacent to the Lease Modifications that dovetail with the location of current mining.  Mining at West Elk is largely performed with underground longwall machinery that moves in a straight line, trending from southeast to northwest.  The location and orientation of existing underground mining to the north of the Lease Modifications can be determined by the southeast-northwest lines of drainage well pads that vent methane from the coal mined underneath. See Figure 2, infra at 28.  Arch Coal's map (not reproduced in the Final EIS) shows that "projected" mining within the Lease Modifications and on leases to the north and private land to the west will parallel existing mining on the parent leases to the north.  See Figure 3, infra at 28.  A similar map the Forest Service prepared, but omitted from the FEIS, displays areas likely to be subsided should mining occur in the Lease Modifications and adjacent land; the areas predicted to subside track closely Arch Coal's map of projected mining.  See Figure 4, infra at 29.

27



**Figure 2.**
**Excerpt of FEIS Figure 3.30b**

**Figure 3.**
**Arch Coal Mine Layout Map (2010)**

Figure 2 is an excerpt of FEIS Figure 3.30b.[65]  The regular, southeast-northwest oriented the red dots indicate methane drainage well pads over mined land to the north of the Lease Modifications area.  The blue area at lower left is private land.

Figure 3 is an excerpt of Arch Coal's 2010 map of the Lease Modifications area entitled "Projected and Maximum … Mine Layout."[66]  This map was not included in the FEIS.  The areas within the dark blue lines identify the location of projected underground mining, including under the Lease Modifications area <u>and</u> private land to the west.  The location of projected mining follows the orientation of existing mining to the north on the parent leases as displayed in the Figure 2.

---

[65]  <u>Id.</u> at 171 (FSLeasing-46968).

[66]  Arch Coal, "Projected and Maximum … Mine Layout" (2010) (Ex. 41) (FSLeasing-55539).

28



**Figure 4.  Forest Service, "Subsidence Under Alternatives 2 and 3" (July 2012)[67]**

Map legend identifies area bounded in red as the area of "reasonably foreseeable subsidence."  This area closely tracks the area of projected mine layout on Arch Coal's 2010 map (see Figure 3, supra at 28).  This map was not included in the FEIS.

_____

Despite the fact that the Agencies had the data necessary to identify the location of mining outside the Lease Modifications, the FEIS asserted that it need not disclose even the general location of such mining because it was too speculative to do so at the leasing stage.[68]  This is an arbitrary rationale, given that the entire FEIS is built around a Mine Plan that makes such assumptions for impacts within the Lease Modifications area.  See

_____

[67]  Forest Service, "Subsidence Under Alternatives 2 and 3" (July 2012) (Ex. 42) (FSLeasing-55650).

[68]  Lease Mods FEIS (Ex. 1) at 531 (FSLeasing-46776 at 47327) ("At this leasing stage there are no mine plans approved for the private lands as they rely solely on a preliminary design as is the case on the lease modification areas, so it is impossible to determine exactly where, of [sic] if, surface disturbance would occur.").

29

Conner, 848 F.2d at 1450 (9th Cir. 1988) (agency cannot fail to estimate the impacts of mining at lease stage).  The Forest Service developed a "Reasonably Foreseeable Mine Plan" (Mine Plan) to "facilitate analyzing potential surface impacts" and to disclose the direct impacts of the leasing decision.[69]  The Mine Plan projected 48 pads for methane drainage wells, and 6.5 miles of road to access them, would be built within the Lease Modifications, disturbing 72 acres.[70]  Site-specific impacts from this construction "are expected to be distributed throughout the [Lease Modifications] area."[71]  The FEIS purported to give the public and decisionmakers a general idea of the resources at stake, and how those resources that might be impacted by including descriptions and maps of existing resources inside the Lease Modifications area.  See, e.g., Figure 1, supra at 26.

The FEIS did not explain why the FEIS developed, and disclosed the impacts of, a Mine Plan for lands within the Lease Modifications area but could not do so for impacted adjacent private and federal lands.  Disclosure of the location and extent of adjacent land coal mining, as well as the values potentially impacted by mine development and the impacts of such mining, will not require a "crystal ball inquiry" any more than the rest of the FEIS.  See Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n, 481 F.2d 1079, 1092 (D.C. Cir. 1973) (NEPA requires "[r]easonable forecasting and speculation").

---

[69]  Id. at 50 (FSLeasing-46847).

[70]  Id. at 53-54 (FSLeasing-46850-51).

[71]  Id. at 100 (FSLeasing-46897); see also id. at 120 (FSLeasing-46917) (assuming that impacts of road and drainage well pad construction to forest resources will "be proportional to the available surface vegetation proportions on the landscape" within the Lease Modifications, and identifying potential impacts to vegetation type by acreage).

Because the FEIS failed to provide any data concerning the location of likely private and public land mining, what little analysis the document contains of impacts to these areas is cursory and un-illuminating, failing to meet NEPA's "hard look" mandate. For example, in its discussion of subsidence impacts, the FEIS merely estimated subsidence from private and adjacent Federal lands by lumping together impacts to both types of land, making it impossible to understand the distinct impacts to adjacent federal lands, as to opposed to impacts to adjacent private land.[72]  The FEIS failed to provide any explanation for this lumping of impacts, or any information disclosing where subsidence is likely to occur.  Will it occur under major roads, or near watersheds already burdened by other impacts?  How will impacts be split evenly between public and private lands?

Similarly, while the FEIS contained an estimate of the total <u>acreage</u> of ground disturbance likely to accompany drainage well pads and road construction on private and adjacent public lands outside of the Lease Modifications (42 acres for well pads and 21 acres for roads to access them), the FEIS again failed to identify even generally where these impacts are likely to occur, and again lumped together impacts to private and public

---

[72]  The FEIS predicts subsidence will impact, inter alia, "~400 acres from mining adjacent reserves in existing federal leases <u>and</u> adjacent private lands."  <u>Id.</u> at 91 (FSLeasing-46776 at 46888) (emphasis added).  The FEIS makes similarly vague representations in numerous other locations when purporting to assess the direct and indirect impacts of the Lease Modifications. <u>See id.</u> at 100, 101, 109, 111, 113-14, 115, 116, 160, 185-86 (FSLeasing-46897, 46898, 46906, 46908, 46910-11, 46912, 46913, 46957, 46982-83).

lands.[73]  These numbers provide no useful information about environmental impacts, and thus fail to take the "hard look" NEPA requires.[74]

Further, the Lease Modifications FEIS not only failed to answer <u>where</u> coal will be mined from adjacent private and public land (<u>i.e.</u>, the general location), but the <u>extent</u> such parcels that will likely be mined.  While the FEIS precisely identified the acreage of the Lease Modifications (1,721 acres),[75] the FEIS contained <u>no figures at all</u> identifying the area of private lands, or of the adjacent public land, at stake.  The agency itself appears to have been confused about the potential extent of mining outside the Lease Modifications.  High Country Advocates could locate no data in the record identifying the extent of adjacent <u>public</u> land likely to be mined.  What information is in the record concerning <u>private</u> land likely to be impacted is contradictory: Arch Coal and private land owners assert that the Lease Modifications will permit mining under 977 acres of private

---

[73]  See <u>id.</u> at 92 (FSLeasing-46889).

[74]  The FEIS also estimated, in the most general terms, the habitat <u>type</u> that may be bulldozed for roads and methane drainage wells on private and adjacent federal land, again lumping together, and not breaking out, the impacts to each parcel.  See <u>id.</u> at 121 (FSLeasing-46918) ("For private lands and adjacent parent lease areas, a total of 63 additional acres of vegetation loss is estimated.  Of this, there would be approximately 41 acres of oak, 19 acres of aspen, 2 acres of spruce/fir, and 2 acres of shrub types").  The FEIS stated that "estimates for vegetation loss on adjacent private lands and parent lease acres were extrapolated using <u>proportional acres</u> of existing vegetation types." <u>Id.</u> (emphasis added).  But proportional to what?  If the Agencies can calculate that <u>fraction</u> of each vegetation type that will be impacted on private and adjacent federal lands by drainage well pads and roads, they must know the <u>total</u> of such habitat in each area that overlies coal to be mined.  Thus they must know the location and extent of the private land and federal lands outside the Lease Modifications areas where impacts will occur.  Yet the FEIS failed to disclose that basic information.

[75]  <u>Id.</u> at 13 (FSLeasing-46810).

land.[76]  Another document states that habitat on private lands to be impacted amounts to

641.8 acres;[77] while yet another document indicates that subsidence on private land alone

– a rough proxy for the location of coal to be mined – amounts to 400 acres.[78]  The

absence of information in the FEIS, and the muddled data in the record, demonstrate that

the Agencies failed to take the "hard look" at disclosing the location and extent of mining

made possible by the Lease Modifications.

The Agencies' failure to disclose the location and extent of the lands likely to be

impacted by mining on private and adjacent federal lands outside the Lease Modifications

violated NEPA's mandate that the agency take a "hard look" at the impacts of the Lease

Modifications decision.  See Davis, 302 F.3d at 1122-23.  The FEIS's evaluation of the

impacts of mining of adjacent reserves for some resources – i.e., the tonnage and

financial benefits – demonstrates that the FEIS could have and should have disclosed the

indirect impacts of off-lease mining for all resources likely to be impacted by such

mining.  See id. at 1123 (finding NEPA analysis arbitrary and capricious in part because

agency disclosed action's indirect impacts to some resources but not others).

---

[76]  See supra at 23 n.57; see also email of J. Blakestad (April 04, 2012 3:57:30 PM) (Ex. 43) (FSLeasing-10208) ("If the federal leases are not modified, 977 acres of our land will not be mined, bypassing an estimated 5.6 million tons of coal"); email of W. Koontz, West Elk Mine (April 23, 2012 4:16:30 PM) (Ex. 44) (FSLeasing-8787) (confirming 977-acre figure).

[77]  Email of D. Garrison, U.S. Forest Service and attachment "BE supplement.docx" (July 13, 2012 2:36:05 PM) (Ex. 45) (FSLeasing-117760 at 117763) (table of "Estimated direct surface impacts by species on private lands" showing "Total acres on private land" to be 641.89 acres).

[78]  R. Taylor memo to file (July 16, 2012) (Ex. 46) (FSLeasing-55603) ("an additional 400 acres of private lands is estimated to be subsided if the lease modifications are mined").

For example, in <u>North Carolina Alliance for Transportation Reform v. U.S. Department of Transportation</u>, the court concluded that the federal agency had "neglected a statutory duty under NEPA" by failing to address all indirect, growth-inducing impacts of a highway project. 151 F. Supp. 2d 661, 697 (M.D.N.C. 2001). The Court explained that the agency disclosed that the project's growth-inducing impacts could have beneficial economic impacts, but "d[id] not discuss any of the potential environmental effects resulting from prospective induced growth." <u>Id.</u> The disclosure of such benefits, the court stated, "underscores the necessity of a <u>complete</u> analysis of the projects[']  indirect impacts." <u>Id.</u> (emphasis added). The FEIS made the same error here, disclosing economic benefits of coal mining outside of the Lease Modifications, but failing to provide any useful information about the location or extent of that mining, or the values that would be impacted. Because the FEIS failed to take the required "hard look" at the impacts of mining an additional 8.9 million tons of coal outside the Lease Modifications, the Agencies violated NEPA's mandates.

**B.      The Lease Modifications FEIS Fails To Disclose The Social, Environmental, And Economic Impacts Of The Lease Modifications' Greenhouse Gas Pollution.**

Although the Lease Modifications will cause greenhouse gas pollution through methane emissions and coal combustion, the Agencies failed to disclose that pollution's social, economic, and ecological impacts. The Agencies' failure is arbitrary because they ignored accepted models developed and used by multiple agencies – and used by the Forest Service in the draft EIS – that permit disclosure of the impacts of the Lease

34

Modifications' pollution.  The FEIS is also arbitrary because the Agencies disclosed the social and economic <u>benefits</u> of mining, and indeed justified their decision approving expanded mining on such benefits, while ignoring the project's climate pollution's costs.

          1.     <u>NEPA Requires Agencies To Disclose The Potential Impacts of Greenhouse Gas Pollution</u>.

It is well settled that where an agency action causes greenhouse gas pollution, NEPA mandates that agencies analyze and disclose the impacts of that pollution.  As the Ninth Circuit has held:

> [T]he fact that climate change is largely a global phenomenon that includes actions that are outside of [the agency's] control ... does not release the agency from the duty of assessing the effects of <u>its</u> actions on global warming within the context of other actions that also affect global warming.

<u>Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin</u>., 538 F.3d 1172, 1217 (9th Cir. 2008) (quotations and citations omitted); <u>see also</u> <u>Border Power Plant Working Grp. v. U.S. Dep't of Energy</u>, 260 F. Supp. 2d 997, 1028-29 (S.D. Cal. 2003) (finding agency failure to disclose project's indirect carbon dioxide emissions violates NEPA).  The need to evaluate such impacts is bolstered by the fact that "[t]he harms associated with climate change are serious and well recognized," and environmental changes caused by climate change "have already inflicted significant harms" to many resources around the globe.  <u>Massachusetts v. EPA</u>, 549 U.S. 497, 521 (2007); <u>see also</u> <u>id.</u> at 525 (recognizing "the enormity of the potential consequences associated with manmade climate change.").

35

2.    <u>NEPA Requires Agencies To Disclose All Impacts, Including Economic and Social Impacts, Of A Proposed Action</u>.

An agency must "consider every significant aspect of the environmental impact of a proposed action." <u>Baltimore Gas & Elec. Co.</u>, 462 U.S. at 107 (quotations and citation omitted). To fulfill this mandate, agencies must disclose the "ecological[,] … economic, [and] social" impacts of a proposed action. 40 C.F.R. § 1508.8(b).

While NEPA does not mandate a specific cost-benefit analysis, if the agency chooses to quantify benefits, it must quantify costs as well. Regulations dictate that when an agency prepares a cost-benefit analysis, it must "discuss the relationship between that analysis and any analyses of unquantified environmental impacts, values, and amenities." 40 C.F.R. § 1502.23. This analysis must fairly account for both benefits and the associated costs. <u>Sierra Club v. Sigler</u>, 695 F.2d 957, 979 (5th Cir. 1983) (once agency chose to "trumpet" a set of benefits, it also had duty to disclose the related costs). "There can be no hard look at costs and benefits unless all costs are disclosed." <u>Id.</u>

Federal courts have struck down NEPA documents because economic and socio-economic benefits were not properly quantified. <u>See, e.g.</u>, <u>id.</u> (setting aside analysis that presented project benefits but not costs). An analysis that overstates the economic benefits of a project violates NEPA by undercutting both of the law's twin goals: "ensur[ing] that agencies take a hard look" at a proposal's environmental impacts, and informing "the public so that they may play a role" in decisionmaking. <u>Hughes River Watershed Conservancy v. Glickman</u>, 81 F.3d 437, 446-48 (4th Cir. 1996) (citing

36

Robertson, 490 U.S. at 349 and setting aside EIS that overstated economic benefits because "it is essential that the EIS not be based on misleading economic assumptions"); see also Natural Res. Def. Council v. U.S. Forest Serv., 421 F.3d 797, 811-13 (9th Cir. 2005) (holding that EIS violated NEPA where it relied on inaccurate economic data and thus "misled" the public).

### 3. NEPA Requires Agencies to Explain Opposing Viewpoints.

NEPA also requires agencies to explain opposing viewpoints and their rationale for choosing one viewpoint over the other. 40 C.F.R. § 1502.9(b) (requiring agencies to disclose, discuss, and respond to "any responsible opposing view"). Courts will set aside an EIS where the agency fails to respond to scientific analysis that calls into question the agency's assumptions or conclusions. See Ctr. for Biological Diversity v. U.S. Forest Serv., 349 F.3d 1157, 1168 (9th Cir. 2003) (finding Forest Service's failure to disclose and respond to evidence and opinions challenging EIS's scientific assumptions violated NEPA); Seattle Audubon Soc'y v. Moseley, 798 F. Supp. 1473, 1482 (W.D. Wash. 1992) ("The agency's explanation is insufficient under NEPA – not because experts disagree, but because the FEIS lacks reasoned discussion of major scientific objections."), aff'd sub nom. Seattle Audubon Soc'y v. Espy, 998 F.2d 699, 704 (9th Cir. 1993) ("[i]t would not further NEPA's aims for environmental protection to allow the Forest Service to ignore reputable scientific criticisms that have surfaced").

4.       The Agencies Violated NEPA By Failing To Evaluate The Social, Economic, and Environmental Costs Of The Lease Modifications' Greenhouse Gas Pollution.

The Agencies violated NEPA by relying on an EIS that partially disclosed the amount of greenhouse gas pollution from foreseeable coal mining and coal combustion, but failed to take the essential next step required for a "hard look:" disclosing the impacts that the millions of tons of pollution would have.  The Agencies' failure to disclose these impacts is particularly arbitrary because they initially used a widely-accepted federal agency protocol – the social cost of carbon – for disclosing the impacts of greenhouse gas pollution in the Draft EIS but then deleted this disclosure, without a reasoned basis, from the FEIS.  The Agencies' failure to adequately account for the costs of greenhouse gas pollution is also arbitrary because the Agencies' decisions relied heavily on the project's alleged social and economic benefits as the basis for their choice among alternatives.

The FEIS admitted that the Lease Modifications will cause two major types of climate pollution: methane emitted during mine operations (through the mine's ventilation system and drainage wells) that the Lease Modifications will prolong; and carbon dioxide emissions when the 19 million tons of coal made available by the decision are burned.[79]  The FEIS contained a "rough estimate" of potential methane emissions, followed by a disclaimer that such emissions "cannot be accurately predicted" because

---

[79]  Lease Mods FEIS (Ex. 1) at 11 (FSLeasing-46776 at 46808) ("Effects on climate change may occur from mining coal which stem from the release of methane … and release of $CO_2$ caused by the burning of coal that is mined"); see also supra at 9 (19 million tons).

38

they are "highly variable."[80]  The FEIS also contained a "conservative" estimate of

carbon dioxide ($CO_2$) emissions from coal combustion, which concluded that the leases

could cause 18.2 million tons of $CO_2$ pollution per year for 2.9 years (for a total of 52.78

million tons).[81]

But beyond these estimates, the FEIS contained no discussion of the impacts

caused by the foreseeable greenhouse gas pollution caused by approving the Lease

Modifications.  The FEIS included a "general" discussion of climate change impacts,

"most[ly] … copied directly from government … documents," but that discussion did not

address the impacts of greenhouse pollution attributable to the Agencies' decision.[82]

Instead, the FEIS begged off any analysis of the climate impacts of the Lease

Modifications themselves, asserting that it is "not possible" because there are no methods

for evaluating the impacts of a single emitter of climate pollution:

> Standardized protocols designed to measure factors that may contribute to climate change, and to quantify climatic impacts, are presently unavailable….
>
> Predicting the degree of impact any single emitter of [greenhouse gases] may have on global climate change, or on the changes to biotic and abiotic systems that accompany climate change, is not possible at this time.  As

---

[80]  Lease Mods FEIS (Ex. 1) at 75-76 (FSLeasing-46872-73).

[81]  Id. at 80 (FSLeasing-46877) (low-end estimate of coal combustion is 18.2 million tons per year); id. at 190 (FSLeasing-46987) (selected alternative will extend mine life by 2.9 years).

[82]  Id. at 83 (FSLeasing-46880).  The FEIS included "[f]or comparison" other numbers – total U.S. and Colorado $CO_2$ emissions for 2010.  Id. at 77 (FSLeasing-46874).  But comparing levels of pollution from a single project to total pollution at a state or national level does not meaningfully disclose the project's actual impacts.

such, … the accompanying changes to natural systems cannot be quantified or predicted at this time.[83]

But the FEIS's claims of impossibility are flatly contradicted by the record in this case, which demonstrates that a standardized federal agency protocol – the social cost of carbon – does exist, and was specifically developed to estimate the social, economic, and ecological impacts of greenhouse gas pollution. The federal social cost of carbon is an estimate of the incremental dollar value of damages associated with an incremental increase in greenhouse gas pollution. It is intended to include changes in net agricultural productivity, human health, property damages, and the value of ecosystem services, all of which climate change can degrade.[84] As such, the social cost of carbon includes not only socioeconomic harm but also harm to the environment. The protocol was developed by a dozen departments and agencies in 2010 to effectively measure the costs and benefits of proposed regulations, as required by Executive Order 12866.[85] The social cost of carbon thus permits decisionmakers to address, and the public to understand, the broad benefits

---

[83] Id. at 83 (FSLeasing-46880) (emphasis added).

[84] Interagency Working Group on Social Cost of Carbon, Technical Support Document (Feb. 2010) ("Interagency Working Group") (Ex. 47) at 1 (FSLeasing-41245 at 41403, 41404); see also Cass R. Sunstein, The Real World of Cost-Benefit Analysis: Thirty-Six Questions (and Almost as Many Answers), 114 Colum. L. Rev. 167, 171-73 (Jan. 2014) (describing origins of interagency agreement on the social cost of carbon).

[85] Interagency Working Group (Ex. 47) at 1-3 (FSLeasing-41245 at 41403, 41404-06). Federal agencies that developed and endorsed the protocol included: the Council on Environmental Quality (which oversees NEPA compliance); the Department of Agriculture; and the Environmental Protection Agency (EPA) (which regulates greenhouse gas emissions). The federal social cost of carbon was developed through a robust process that included "[t]echnical experts from numerous agencies [meeting] on a regular basis to consider public comments, explore the technical literature in relevant fields, and discuss key model inputs and assumptions." Id. at 1 (FSLeasing-41404).

of reducing carbon emissions, or the costs of increasing emissions, in analyses of actions that may have small, or "marginal," impacts on cumulative global emissions.[86]  Agencies have routinely used the social cost of carbon protocols to achieve these goals when evaluating the costs and benefits of rulemakings, and the Environmental Protection Agency (EPA) has recommended that other agencies use the protocol in NEPA reviews.[87]

In fact in this case, the Agencies themselves initially used the social cost of carbon to attempt to disclose at least some of the project's impacts, but then deleted that disclosure from the FEIS.  The Lease Modifications Draft EIS contained a section analyzing the leasing decision's impacts on socioeconomics.[88]  As part of that analysis, the Draft EIS estimated economic benefits (in dollars) of numerous values, including the value of: coal recovered; payroll; materials, supplies and services purchased; and

---

[86]  Id. at 1 (FSLeasing-41404).

[87]  For example, EPA, the Department of Transportation and the Department of Energy have utilized the Interagency Working Group's approach in rulemakings.  See, e.g., EPA and National Highway Traffic Safety Administration, Final Rule, 2017 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions, 77 Fed. Reg. 62,624, 63,004-06 (Oct. 15, 2012); Department of Energy, Final Rule, Energy Conservation Program: Energy Conservation Standards for Standby Mode and Off Mode for Microwave Ovens, 78 Fed. Reg. 36,316; 36,349-52; 36,363-64 (June 17, 2013) (explaining basis for social cost of carbon analysis and identifying range of benefits from reducing energy use of appliances).  EPA has recommended that other federal agencies use the Interagency Working Group's approach in NEPA documents.  See Sarah E. Light, NEPA's Footprint: Information Disclosure as a Quasi-Carbon Tax on Agencies, 87 Tul. L. Rev. 511, 545-46 & n.160 (Feb. 2013) (describing EPA recommendation that State Department, in evaluating impacts of Keystone XL Pipeline, "explore … means to characterize the impact of the GHG emissions, including an estimate of the 'social cost of carbon' associated with potential increases of GHG emissions.").

[88]  Lease Mods Draft EIS (Ex. 12) at 147-52 (FSLeasing-9871 at 10035-10040).

royalties.[89]  Against these benefits, the Draft EIS weighed two potential "costs": (1) the cost of disturbing forest lands; and (2) the cost of greenhouse gas emissions in the form of methane (in dollars, based on a per-ton cost of $CO_2$ as estimated by the Interagency Working Group's social cost of carbon protocol).[90]  Although this analysis omitted the reasonably foreseeable greenhouse gas pollution from burning the Lease Modifications' coal, it shows the Agencies were perfectly capable of evaluating the impacts of project-level greenhouse gas pollution using the social cost protocol.

But the Agencies abandoned this analysis in the FEIS without explanation. Instead, the FEIS added to the project's previously estimated economic benefits, but eliminated any reference to the environmental, social and economic costs due to its greenhouse gas pollution.[91]  Moreover, the FEIS did not replace the social cost of carbon with any other qualitative or quantitative analysis for the impacts of this project's climate pollution.  Instead, the FEIS bafflingly asserted that "[a]dditional information has been added to FEIS to reflect social costs of coal and coal combustion," and that "social costs

---

[89]  Id.

[90]  Id. at 152 (FSLeasing-10040) (identifying an "Additional $6.9 million in GHG emissions [383,000 tons of CO2 equivalent methane * $21 per ton of CO2) (Interagency Working Group 2010)" as a factor in the Agencies' review of "Benefits/Costs")].  BLM included a virtually identical analysis in its preliminary EA on the Lease Modifications.  See BLM Preliminary EA (Ex. 13) at 49 (BLM_mods7213 at 7261).

[91]  The FEIS retains the Draft EIS's estimates of the project's alleged economic benefits, but adds new information concerning direct economic benefits, the value of bonus bids, and rental payments.  Lease Mods FEIS (Ex. 1) at 188-91 (FSLeasing-46776 at 46985-88).

were discussed in the FEIS (Section 3.33)."[92]  But neither the FEIS in general, nor the

section of the FEIS specifically cited, contained any analysis at all addressing the impacts

of the Lease Modification's greenhouse gas pollution.[93]

The Final EIS's puzzling response to comments may have resulted from the fact

that a BLM economist proposed disclosing that the cost of carbon pollution could be

significant, an admission another agency planner later ordered removed.  BLM economist

David Epstein provided a draft of a section of the FEIS to the Forest Service with edits

including this additional paragraph:

> Placing quantitative values on greenhouse gas emissions is still
> controversial.  Social cost estimates for a ton of carbon dioxide emitted
> range from $5 to over $800 (Interagency Working Group 2010; F.
> Ackerman & E. Stanton, Climate Risks and Carbon Prices: Revising the
> Social Costs of Carbon, 2010).  Considering the 1.23 million tons of carbon
> dioxide equivalent emissions [from methane] the West Elk mine emits
> annually, the cost could range from a moderate $6 million per year to an
> overwhelming $984 million per year.[94]

---

[92] Id. at 536 (FSLeasing-47332) (emphasis added); id. at 539 (FSLeasing-47335) (emphasis added).

[93] BLM, in approving the Lease Modifications, stated: "the benefit-cost analysis was removed from the FEIS because it was determined not to provide accurate analysis to inform USFS and BLM decisions."  BLM Lease Mods ROD (Ex. 19) App. B, at 2 (BLM_mods-9817 at 9848).  BLM's record contains no evidence of a "determination" nor evidence to support its conclusion.  Further, the analysis of benefits and cost was not removed; the FEIS only removed the costs attributable to the federal social cost of carbon.

[94] Email of D. Epstein, Economist, BLM State Office to N. Mortenson, Forest Service (Ex. 48) (July 19, 2012 6:08 PM) (FSLeasing-116520 at 116526).  Mr. Epstein does not explain why the federal social cost of carbon is "controversial."

A week later, however, a planning "coordinator" at BLM stated that Mr. Epstein's paragraph "need[s] to be removed."[95]  The email provides no explanation for the "need" to "remove[]" the analysis of the social cost of carbon, nor does the FEIS justify the lack of any analysis of the impacts of the Lease Modifications' greenhouse gas pollution.

It is thus clear that the Agencies understood that a protocol was available for disclosing the greenhouse gas pollution impacts of the Lease Modifications, and initially applied that protocol, contradicting their protestations that it was "not possible" to disclose such impacts because the proper protocols were "not available."  By refusing to use an accepted Federal approach to disclosing the impacts of the project's greenhouse gas pollution, the Agencies failed to take the "hard look" NEPA requires, and ignored the law's mandate to use the "best available scientific information."  Colo. Envtl. Coal., 185 F.3d at 1171.

At least one federal court has specifically set aside an agency action because the agency failed to account for the social cost of carbon.  See Ctr. for Biological Diversity, 538 F.3d at 1200.  The Ninth Circuit, in weighing a challenge to a federal agency cost-benefit analysis of fuel economy regulations, noted that numerous studies – including one by the National Academy of Sciences – put a price on the value of $CO_2$ emissions reduced.  Id. at 1199.  The court found that while those studies identified a range of values, none assigned a value of $0 per ton of $CO_2$ emissions reduced, the value

---

[95]  Email of C. Reed, Planning and Environmental Coordinator to N. Mortenson, Forest Service (Ex. 49) (July 26, 2012 7:43 AM) (FSLeasing-63963 at 63981).

implicitly chosen by the agency through its failure to assign any costs to carbon emissions. Id. at 1200. The court held that an analysis that assumed no costs from carbon pollution was arbitrary and capricious. Id. The Lease Modifications FEIS did just that here, effectively zeroing out the project's impacts to climate change by alleging it was "not possible" to disclose such impacts because the proper protocols were "not available."[96] These statements fly in the face of the federal social cost of carbon, designed specifically to disclose such impacts.

The Agencies' failure to address the adverse impacts of the Lease Modifications' greenhouse gas pollution is not a mere "fly-speck" that can be ignored because balancing the value of the action's benefits and costs was at the core of the Agencies' decisions here. As BLM's Mr. Epstein noted, the costs of climate change caused by the Lease

---

[96] Two cases holding that an agency need not analyze the impacts of an individual project's emissions on climate change are readily distinguishable. In WildEarth Guardians v. Jewell, the D.C. Circuit upheld a NEPA analysis of a coal lease where the agency disclosed the lease's contribution to statewide and global emissions and where the agency reasonably concluded that "it is not possible" to identify specific climate impacts from the lease's contribution. 738 F.3d at 309. Neither the court nor plaintiffs addressed the federal social cost of carbon estimates that made possible the evaluation of such impacts. This is hardly surprising given that the interagency protocol was developed only a month before BLM's record of decision there. See id. at 302 (West Antelope BLM ROD issued Mar. 2010); see Interagency Working Group (Ex. 47) at cover page (dated Feb. 2010) (FSLeasing-41245 at 41403). Similarly, in WildEarth Guardians v. U.S. Forest Service, the court upheld a similar coal lease analysis for a previous decision to expand the West Elk mine where "[t]he Forest Service stated that it could not provide an estimate of the effect of this project on climate change because of the lack of appropriate models and research," and plaintiffs failed to identify "any method … that would enable the Forest Service to describe with particularity how the project would contribute to overall climate change." 828 F. Supp. 2d at 1240. Again, this agency decision predated the federal social cost of carbon. Further, in the present litigation, the Agencies initially used (and High Country Advocates pressed them to consider) the federal social cost of carbon to enable the agency to disclose the impacts of greenhouse gas pollution from this project. See supra at 41.

45

Modifications may be "overwhelming" compared to the project's economic benefits. The selected alternative may result in 52.78 million tons of $CO_2$ emissions for the life of the project.[97] Setting the price of carbon pollution at $21 per ton of $CO_2$ emissions – the mid-level figure in the 2010 interagency social cost of carbon report and the one used by the Lease Modifications Draft EIS – the social cost of the Lease Modification's greenhouse gas pollution is over $1.1 billion.[98] By this measure, the costs borne by the global environment, economy and society for coal combustion resulting from the Lease Modifications is slightly greater than the FEIS's estimate of $1.08 billion for the Lease Modifications' direct economic impacts.[99] Using the range of costs recommended in the federal social cost of carbon report, of between $4.7 and $64.9 per ton, would result in

---

[97] See supra at 39.

[98] See Lease Mods Draft EIS (Ex. 12) at 151-152 (FSLeasing-9871 at 10039-40) (assuming social cost of carbon is $21 per ton); Interagency Working Group (Ex. 47) at 3, 25 (FSLeasing-41245 at 41403, 41406, 41428) (identifying range of values for social cost of carbon but concluding $21 in 2010 dollars is the "central value"); see also C. Sunstein, 114 Colum. L. Rev. at 171-72 (identifying the figure $21.40 as "the central value, used as the basic number for calculating the benefits of greenhouse gas reductions").  18.2 million tons of $CO_2$ / year * 2.9 years * $21 per ton of $CO_2$ = $1.108 billion.

[99] See Lease Mods FEIS (Ex. 1) at 190 (FSLeasing-46776 at 46987).

potential costs from coal combustion of between $248 million and $3.4 billion,[100] potentially dwarfing the project's alleged economic benefits.[101]

These potentially significant social costs are important because Forest Supervisor Hazelhurst relied heavily on the project's estimated social and economic <u>benefits</u> to justify her decision approving the Lease Modifications.  The Supervisor stated in Forest Service's ROD that she did not adopt the "no action" alternative because "it does not achieve <u>social and economic objectives</u> in the area.  Estimates suggest nearly a billion dollars in lost revenues, royalties, payroll and local payment for goods and services would be foregone by implementing this Alternative."[102]  But the estimated billion dollars in incremental climate change damage from coal combustion forced on society by the decision are nowhere disclosed.

By carefully evaluating the economic benefits of the project but ignoring the costs, the Forest Service put on blinders making a "hard look" impossible.  Simply put, "[t]here can be no 'hard look' at costs and benefits unless all costs are disclosed."  <u>Sigler</u>, 695

---

[100]  Interagency Working Group (Ex. 47) at 1 (FSLeasing-41245 at 41403, 41404 ) (displaying range of values for costs of $CO_2$ per ton in 2019 from $4.7 per ton to $64.9 per ton).  18.2 million tons of $CO_2$ / year * 2.9 years * $4.7 per ton of $CO_2$ = $248 million; 18.2 million tons of $CO_2$ / year * 2.9 years * $64.9 per ton of $CO_2$ = $3.425 billion.

[101]  Even this figure may be low since it omits from the calculation of carbon pollution all methane emissions from mine operation.  <u>See</u> High Country Citizens' Alliance 2012 Forest Appeal (Ex. 16) at 16-18 (FSLeasing-131215 at 131216, 131232-34).

[102]  Forest Service Lease Mods ROD (Ex. 15) at 9 (FSLeasing-69890 at 69898) (emphasis added).  For BLM's part, Colorado BLM State Director Hankins specifically adopted the Forest Service's reasons for approving the ROD.  BLM Lease Mods ROD (Ex. 19) at 5 (BLM_mods-9817 at 9823) ("The BLM concurs with the rationale ("Reasons for the Decision") presented in the USFS ROD [for] the selection of Alternative 3").

F.2d at 979; see also Hughes River Watershed Conservancy, 81 F.3d at 447 (setting aside EIS that overstated economic benefits); Natural Res. Def. Council, 421 F.3d at 811-12 (setting aside EIS that relied on inaccurate economic data). The FEIS's failure to address the impacts of the Lease Modifications' greenhouse gas pollution leaves a void to which this Court cannot defer. See Rocky Mountain Wild, 2013 WL 3233573, at *3 n.3. Because the FEIS violates NEPA, the Lease Modifications must be set aside.

Finally, the Agencies' decision to ignore the social cost of the project's greenhouse gas pollution violates NEPA for an additional reason: the agency failed to provide a rationale for declining to use a protocol adopted by a dozen agencies, used repeatedly over the years, and used initially in the Draft EIS. Agencies must explain opposing viewpoints and provide their rationale for choosing one approach over the other. 40 C.F.R. § 1502.9(b) (requiring agencies to disclose, discuss, and respond to "any responsible opposing view"); Ctr. for Biological Diversity, 349 F.3d at 1168. Here, the Forest Service responded to comments urging the use of social cost of carbon protocol by alleging the FEIS contained such analysis when it did not. See supra at 42-43. Further, BLM stated only in a conclusory, post hoc manner in its ROD that "the benefit-cost analysis was removed from the FEIS because it was determined not to provide accurate analysis to inform [the Agencies'] decisions."[103] BLM provided no basis for this conclusion. Nor does it explain why a protocol developed by the USDA EPA and ten

---

[103]   BLM Lease Mods ROD (Ex. 19) App. B, at 2 (BLM_mods-9817 at 9848).

48

other agencies, and that their own economist proposed be used to evaluate this decision, suddenly became, as BLM alleged, "not … accurate."[104]  The Agencies' failure to explain why they would not use an accepted federal agency protocol to address the impacts of climate pollution violates NEPA.

**C.      The FEIS's Failure To Analyze Direct Volatile Organic Compound (VOC) Emissions Associated With Methane Venting Violates NEPA.**

Despite evidence that volatile organic compounds –a key ingredient of smog – are emitted from West Elk's methane drainage wells, the Agencies failed to estimate or quantify the foreseeable emissions caused by extending the mine's life by nearly three years, in violation of NEPA.

1.      NEPA Requires Agencies To Disclose Impacts And To Obtain Necessary Information.

NEPA requires that issues identified as significant and carried forward for analysis will be adequately analyzed and assessed in an EIS.  Agencies must disclose the "environmental impacts" of alternatives, including "[d]irect effects and their significance."  40 C.F.R. § 1502.16(a).  EISs must contain high-quality information and accurate scientific analysis.  Id. § 1500.1(b).

NEPA further requires that where agencies identify that information "is incomplete or unavailable …, the agency shall always make clear that such information is lacking."  Id. § 1502.22.  Agencies "shall" nonetheless obtain information relevant to adverse impacts where it "is essential to a reasoned choice among alternatives and the

---

[104]  See supra at 43 n.93.

overall costs of obtaining it are not exorbitant." 40 C.F.R. § 1502.22(a). As such, NEPA

mandates that agencies perform the research necessary to understand the difference in

impact among alternatives. Save Our Ecosystems v. Clark, 747 F.2d 1240, 1244 n.5,

1249 (9th Cir. 1984) ("Section 1502.22 clearly contemplates original research if

necessary;" "[a]s long as the information is ... 'significant,' or 'essential,' it must be

provided when the costs are not exorbitant …."); Montgomery v. Ellis, 364 F.Supp. 517,

528 (N.D. Ala. 1973) ("NEPA requires each agency to undertake the research needed

adequately to expose environmental harms and, hence, to appraise available

alternatives."). If the costs of obtaining the missing information are "exorbitant,"

agencies have a duty to evaluate the potential, reasonably foreseeable impacts in the

absence of relevant information, using a four-step process. 40 C.F.R. § 1502.22(b).

Courts have set aside NEPA analysis where agencies failed to disclose that information

was unavailable or failed to obtain the necessary information. See, e.g., Lands Council v.

Powell, 395 F.3d 1019, 1031-32 (9th Cir. 2005) (agency failure to disclose relevant

shortcomings in model used for analysis violated NEPA); Mid States Coal. for Progress

v. Surface Transp. Bd., 345 F.3d 520, 549-50 (8th Cir. 2003) (pursuant to 40 C.F.R.

§ 1502.22, agency was required to evaluate potential air quality impacts associated with

increased availability and utilization of coal).

2.    The Lease Modifications FEIS Failed To Disclose The Foreseeable Impacts Of VOC Emissions.

The FEIS failed to analyze and assess or quantify the volatile organic compound (VOC) emissions that will result from the reasonably foreseeable impacts of methane venting due to the Lease Modifications.  While BLM acknowledged that the issue of air pollution, including VOC emissions, was "key," and that the Lease Modifications will cause VOC pollution, the FEIS downplayed the only available information the Agencies had, excused the Agencies' failure to gather more information in part on the basis that a state agency will collect such data later, and failed to comply with NEPA's mandate for addressing incomplete information.  The Lease Modifications decision must be remanded until the Agencies address these violations.

VOC emissions are a significant concern because atmospheric VOCs and nitrogen oxides react in the presence of sunlight to form ozone pollution (smog).[105]  Ground-level ozone poses a threat to public health.[106]  Under Clean Air Act regulations, VOCs include "any compound of carbon," including propane, pentane, butane, hexane and benzene.  40 C.F.R. § 51.100 (s)(1).  The Agencies recognized that methane venting releases VOC pollutants, and concluded that such pollution was a "Key Issue" to be addressed through

---

[105]  See Lease Mods FEIS (Ex. 1) at 57 (FSLeasing-46776 at 46854).

[106]  Id. at 58 (FSLeasing-46776 at 46855) ("Ozone in the lower atmosphere is harmful to human health").  See also EPA, Final Rule, National Ambient Air Quality Standards for Ozone, 73 Fed. Reg. 16,436, 16,436 (Mar. 27, 2008) (describing "an array … adverse health effects" from ozone pollution).

51

NEPA.[107]  The FEIS also admitted that the Lease Modifications will prolong the life of the mine and methane venting, thus resulting in additional years of VOC emissions.[108]

But the FEIS contained almost nothing addressing the scale, quantity, or impacts of VOC pollution resulting from the Lease Modifications.  The FEIS acknowledged that two data samples taken by Arch Coal in 2009 (and provided to BLM nearly three years before the FEIS was published) confirm that methane drainage wells emit VOC pollution.[109]  Despite evidence of such pollution, the FEIS explicitly stated that "no attempt is made here to quantify" such pollution.[110]  The FEIS also implied that the Agencies need not analyze and assess VOC emissions from methane venting because the Colorado Air Pollution Control Division "will be requiring all coal mines in the state, including the West Elk Mine, to gather additional data to provide a more accurate annual estimate of VOC emissions."[111]

---

[107]  BLM Lease Mods ROD (Ex. 19) at 8 (BLM_mods-9817 at 9826) (identifying as one of the "BLM Key Issues" for the NEPA process "Effects of the Proposed Action may occur on air quality including … VOCs …."); BLM Preliminary EA (Ex. 13) at 10 (BLM_mods7213 at 7222) (same); Lease Mods FEIS (Ex. 1) at 75-76 (FSLeasing-46776 at 46872-73); id. at 9-10 (FSLeasing-46806-07) (identifying VOC emissions as an "[i]ssue carried forward" in the FEIS).

[108]  Lease Mods FEIS (Ex. 1) at 54 (FSLeasing-46776 at 46851) (Lease Modification will extend mine life by 2.9 years).

[109]  Id. at 75-76 (FSLeasing-46872-73); see also Analytical Solutions, Inc., Extended Gas Analysis Report, attached to Lease Mods FEIS (Ex. 1) (FSLeasing-46776 at 47115).

[110]  Lease Mods FEIS (Ex. 1) at 76 (FSLeasing-46776 at 46873).

[111]  Id.  The FEIS also asserted that VOC pollution from methane drainage wells must be low because, as yet, no ozone violations in the immediate mine area have been detected, and the Lease Modifications will merely extend ongoing emissions for about three years.  Id.  The FEIS made this leap although it admitted that, "there are few [air quality] monitors close to the mine."  Id.  This ignores the fact that drainage well emissions will continue as a result of the Lease

52

The FEIS's "analysis" failed to take the hard look at VOC emissions.  First, the FEIS discounted information obtained from the 2009 sampling of two methane drainage wells, but refused to dig any deeper.[112]  The data suggest that VOC emissions from such wells may be significant.  When one extrapolates the levels for hexane and propane from these two samples to an annual basis using reasonable assumptions, hexane emissions may exceed two tons, above the state level for permitting and reporting hazardous air pollutants, and propane emissions may exceed 100 tons, a level that could subject the West Elk mine to more rigorous permitting under Title V of the Clean Air Act.[113]  This underscores why VOC pollution is a "key issue," especially given rising ozone levels in western Colorado.[114]  And while the FEIS stated that "it is not known how accurately these values [from the two samples] represent average or potential" VOC emissions, the Agencies did nothing over the multi-year process of preparing the EIS (and during which BLM had data identifying VOCs in drainage well emissions) to research or otherwise test

Modifications, a significant impact because ozone levels in western Colorado are getting worse due to contributions from many sources.  See letter of J. Nichols, WildEarth Guardians (July 9, 2012) (Ex. 50) at 5-6 (FSLeasing-40422 at 40423, 40427-28).

[112]  The FEIS disparaged the drainage well data as "limited," and stated that "it is not known how accurately these values represent average or potential" VOC emissions.  Lease Mods FEIS (Ex. 1) at 76 (FSLeasing-46776 at 46873).  The FEIS further asserted methane drainage well emissions generally are "variable."  Id.

[113]  See letter of J. Nichols, WildEarth Guardians (Ex. 50) at 3-4 (FSLeasing-40422 at 40423, 40425-26).

[114]  Id. at 5-6 (FSLeasing-40427-28).  See also supra 52 n.111.  Given the likelihood that VOC emissions from methane drainage wells may be significant, and that the agencies have no other data upon which to rely, the FEIS's assertion that "[t]he mine currently emits and will continue to emit … ozone precursors at relatively low levels" is without basis.  See Lease Mods FEIS (Ex. 1) at 76 (FSLeasing-46776 at 46873).

the data.[115]  Failure to undertake such necessary research violates NEPA.  See Save Our Ecosystems, 747 F.2d at 1244 n.5.

Second, the FEIS's statement that VOC emissions are likely "highly variable" (because they are tied to allegedly variable methane emissions) does not justify the agency doing no analysis, or presuming VOC pollution levels will be low.[116]  If emissions are "highly variable," such pollution may actually be higher than the existing data indicate.  Further, while the FEIS claimed methane emissions to which VOCs are tied are "highly variable," the FEIS included an exact figure for the amount of methane released over a year (58,663 tons), demonstrating that no matter how "variable" emissions are, methane drainage well emissions can be measured and assessed.[117]  Here, the Agencies simply chose not to undertake measurements necessary to gather the data.  Again, this failure to gather the necessary information violates NEPA.

Third, the fact that a state agency will require the West Elk and other mines to gather data "to provide a more accurate annual estimate of VOC emissions," [118] does not absolve the Agencies from discharging their NEPA obligations to obtain high quality information before approving the Lease Modifications.  If anything, the fact that the

---

[115]  The Agencies did nothing despite the fact that the mine itself monitors methane emissions from methane drainage wells on a daily basis.  See, e.g., letter of R. Sweetwood, Mountain Coal Co. to D. Dyer, BLM (Dec. 30, 2010) (Ex. 51) (FSLeasing-139271 at 139272-78) (attaching daily methane emission data for West Elk from third quarter of 2010).

[116]  Lease Mods FEIS (Ex. 1) at 76 (FSLeasing-46776 at 46873).

[117]  Id. at 75, 506 (FSLeasing-46872, 47302).  See also supra n.115 (West Elk emissions data).

[118]  Id. at 76 (FSLeasing-46873).

Colorado Air Pollution Control Division (APCD) may later require West Elk to gather such data underscores that the Agencies could have done the same in the nearly four years it took the Agencies to approve the Lease Modifications. Their failure to do so shows the Agencies failed to take the hard look NEPA requires.

In any case, federal courts have repeatedly found that federal agencies cannot rely on another agency's information gathering or conclusions to discharge their own NEPA obligations. In Calvert Cliffs' Coordinating Committee, Inc. v. U.S. Atomic Energy Commission, 449 F.2d 1109 (D.C. Cir. 1971), the D.C. Circuit held that relying on another agency's permitting duty to decline to disclose information pursuant to NEPA "neglects [NEPA's] mandated balancing analysis. Concerned members of the public are thereby precluded from raising a wide range of environmental issues in order to affect particular [agency] decisions. And the special purpose of NEPA is subverted." Id. at 1123. Similarly, in South Fork Band Council v. U.S. Department of the Interior, 588 F.3d 718 (9th Cir. 2009), the Ninth Circuit rejected BLM's argument that NEPA did not require the agency to consider air impacts from certain mining operations because the facility was regulated under a state air permit. The court stated: "A non-NEPA document – let alone one prepared and adopted by a state government – cannot satisfy a federal agency's obligations under NEPA." Id. at 726. The Agencies' failure here to obtain data about the key issue of VOC emissions, and their implication that failure can be excused

because APCD will gather information later, violated NEPA's mandate that the agency use the best available science.

Finally, the Agencies cannot argue that they complied with NEPA's mandate to address incomplete or unavailable information concerning VOC emissions. Although the FEIS implied that information concerning such pollution is "incomplete or unavailable," it: (1) failed to make that specific finding as required by NEPA; (2) failed to address whether the information was "essential to a reasoned choice among alternatives;" and (3) failed to make any determinations addressing agencies whether the costs of obtaining the information are "exorbitant."[119] In any event, the Agencies also could not argue that the information was otherwise "unavailable" or "exorbitant" because the Agencies assumed APCD would obtain that the data. The Agencies' failure to collect such information or explain why it would be exorbitantly costly to do so violates NEPA.

## III.    THE COLORADO ROADLESS RULE FEIS FAILS TO ADEQUATELY ANALYZE IMPACTS OF GREENHOUSE GAS POLLUTION.

A key purpose of the Colorado Roadless Rule ("Colorado Rule") was to allow road building in North Fork Valley roadless areas so that 347 million tons of coal could be removed – coal that would otherwise be left in the ground.[120] Prolonging the life of

---

[119]  See 40 C.F.R. § 1502.22(a) & (b).

[120]  The purpose and need for Colorado Roadless Rule included "facilitating exploration and development of coal resources in the North Fork coal mining area." CRR FEIS (Ex. 27) at 6 (CRR-154023 at 154038). See also Table 3-9, id. at 80-81 (CRR-154023 at 154112-13) (listing recoverable coal resources by alternative); Notice of Proposed Rulemaking, Colorado Roadless Rule, 76 Fed. Reg. 21,272, 21,279 (Apr. 15, 2011) (CRR-127220 at 127227) ("Increased

the North Fork coal mines for decades will cause substantial emissions of methane, a powerful greenhouse gas, and other air pollutants during mining. In addition, burning that coal will produce greenhouse gas pollution. Yet the Colorado Rule FEIS failed to include any meaningful analysis of the greenhouse gas pollution the Rule would unleash. The agency's claim that such analysis was impossible is undercut by the FEIS's detailed accounting of alleged employment and economic benefits from prolonged mining. Because the FEIS failed to take the required "hard look" at the greenhouse gas impacts of methane venting, coal mine operation, and coal combustion, or offer a reasonable explanation why it could not, the FEIS violates NEPA and the Rule must be set aside.

### A.    The Colorado Rule FEIS Failed To Adequately Disclose Greenhouse Gas Pollution From Coal Mine Operation.

The Colorado Rule FEIS admitted that increased methane venting, caused by prolonged coal mining, is a reasonably foreseeable impact of the Rule, but failed to adequately analyze this pollution. The FEIS stated: "Coal mining would result in the release of methane ... a much more potent greenhouse gas than carbon dioxide.… [T]he temporal extent of methane release would increase under Alternative 2 [the adopted Rule] by up to 30-40 years."[121] But while the FEIS acknowledged that the Rule could result in

---

management flexibility [under the proposed rule] is primarily needed ... to allow access to coal reserves in the North Fork coal mining areas ....").

[121]  CRR FEIS (Ex. 27) at 129 (CRR-154023 at 154161). See also id. at 138 (CRR-154170). ("Common sources" of greenhouse gas pollution from mining include "combustion associated with heavy machinery and other equipment, methane venting for miner safety, and the release of some soil carbon associated with site development.").

a third of a century (or more) of additional methane pollution from North Fork mines when compared to the "no action" alternative, the Forest Service declined to quantify that pollution or otherwise disclose these impacts in any meaningful way.

Instead, the FEIS alleged that "[t]here is no way to reasonably forecast future methane emissions" for different alternatives.[122]  The FEIS claimed impossibility because "[a]ny future activities or actions related to this rule-making," that is, decisions to mine coal, "are uncertain at best and therefore emissions inventories for greenhouse gases are too speculative for estimation or quantification," [123] and because methane emissions can vary by mine-specific factors (like mine age, carbon content of the coal, and depth of the coal seam).[124]  The Forest Service thus suggested that it would be better to postpone detailed analysis of methane pollution until the site-specific project level – years after the Colorado Roadless Rule decision which paves the way for these emissions.[125]  In its place, the agency's analysis contained only the coarsest sort of tool to compare alternatives – a "relative ranking" of the potential for greenhouse gas emissions from coal mining, where one star represented the "lowest relative potential for emissions among

---

[122]  Id. at 134 (CRR-154023 at 154166).

[123]  Id. at 137-38 (CRR-154023 at 154169-70).  Despite readily available methane emissions data collected by West Elk, see supra n. 115, as well as EPA estimates on which to generate a reasonable estimate of methane emissions, see infra at 61, the Colorado Rule FEIS relies on a single decade-old study regarding a single North Fork mine to conclude that greenhouse gas emissions likely to result from coal mining made possible by the Roadless Rule will be small relative to the entirety of all U.S. greenhouse gas pollution.  CRR FEIS (Ex. 27) at 134 (CRR-154023 at 154166).

[124]  Id. at 129 (CRR-154161).

[125]  CRR FEIS (Ex. 27) at 129 (CRR-154023 at 154161).

alternatives" and four stars was the "highest relative potential for emissions among alternatives."[126]  This crude metric made it impossible for the public or decisionmaker to understand or evaluate the magnitude of the difference of climate pollution among the proposed alternatives.

None of the FEIS's excuses for failing to undertake an analysis of the Colorado Rule's greenhouse gas pollution finds support in the record.  First, the FEIS's excuse that it could not predict methane pollution because "[a]ny future activities or actions related to this rule-making are uncertain at best"[127] are utterly contradicted by the fact that the Colorado Rule FEIS contained a detailed analysis – based on numerous assumptions and projections and on existing available data – of the impact of future roadless area coal mining on income, jobs, tax revenues, other economic benefits, and on some environmental values.  For example, for each alternative, the FEIS projected:  the total recoverable coal reserves;[128] how long mining would continue;[129] and the number of road miles built within roadless lands to facilitate coal mining.[130]  The FEIS devoted 13 pages

---

[126]  Id. at 137-39 (CRR-154169-71).

[127]  Id. at 137-38 (CRR-154169-70).

[128]  157 million tons for Alternative 1, 504 million for Alternatives 2 and 4, and 715 million for Alternative 3.  Table 3-9, CRR FEIS (Ex. 27) at 80-81 (CRR-154023 at 154112-13).

[129]  See id.; see also Final Rule and Record of Decision, Colorado Roadless Rule ("Colorado Rule ROD"), 77 Fed. Reg. 39,576, 39,602 (July 3, 2012) (CRR-160281 at 160282, 160308) ("[t]he final rule ... could extend coal mining activity in the North Fork Valley by as much as 34 years").

[130]  16 miles for Alternative 1, 50 miles for Alternatives 2 and 4, and 64 miles for Alternative 3.  CRR FEIS (Ex. 27) at 73-79 (CRR-154023 at 154105-11).

59

to modeling and analysis of the Rule's economic impacts, which predicted, <u>inter alia</u>, the "direct, indirect, and induced effects for output (production value), employment, and labor income by alternative," for future coal mining.[131]  Projected production value, labor income, state royalties, and property tax due to coal mining in roadless areas are calculated down to the nearest $100,000, and the number of jobs is estimated exactly.[132]

It is the essence of arbitrary and capricious decisionmaking for the Forest Service to conclude that future coal mining in roadless areas under the Rule was certain enough to disclose the <u>upside</u> to jobs and the economy, but too uncertain to disclose the <u>downside</u> of methane pollution.  The D.C. Circuit struck down a similar agency attempt to forego analysis of environmental impacts, finding the agency's excuses "have a hollow ring" given that the agency had "already prepared a complex cost-benefit analysis" of the agency action.  <u>Scientists' Inst. for Pub. Info.</u>, 481 F.2d at 1097.[133]  Here, the FEIS's refusal to address greenhouse gas pollution impacts on the grounds that future mining was too "uncertain" similarly rings hollow in light of the FEIS's determination that future coal mining was foreseeable enough to calculate jobs, income, and tax receipts.

Second, the Forest Service's additional rationale that it was impossible to project methane emissions due to the complexity of the task is the very type of explanation

---

[131]  Table 3-71, CRR FEIS (Ex. 27) at 318 (CRR-154350).  <u>See also</u> CRR FEIS (Ex. 27) at 315-327 (CRR-154347-59) (economic analysis).

[132]  <u>Id.</u> at 318 (CRR-154350).

[133]  <u>See also</u> <u>Sigler</u>, 695 F.2d at 979 ("There can be no 'hard look' at costs and benefits unless all costs are disclosed.").

courts have long struck down because NEPA requires making projections about uncertain outcomes.  As the D.C. Circuit explained, "[r]easonable forecasting and speculation is … implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as 'crystal ball inquiry.'"  Scientists' Inst. for Pub. Info., 481 F.2d at 1092.  "If it is reasonably possible to analyze the environmental consequences in an [EIS], the agency is required to perform that analysis."  Kern v. U.S. Bureau of Land Mgmt., 284 F.3d 1062, 1072 (9th Cir. 2002) (finding both EIS and later EA inadequate under NEPA).

Finally, record evidence confirms that, Forest Service protestations notwithstanding, reasonable projections of methane pollution were possible.  Dr. John Power, a Ph.D. economist and former professor of Economics at the University of Montana, submitted a report that incorporated recent EPA estimates of past methane emissions from North Fork mines.[134]  Dr. Power used this data to illustrate that a mine in the Powder River Basin released as little as 1/90th (or about 1.1%) of the methane per ton of coal mined compared to a North Fork mine.[135]  Dr. Power was then able to make projections about the differences in methane emissions among the Colorado Rule alternatives.  He concluded that if the Colorado Rule was not adopted, some coal

---

[134]  J. Power, Greenhouse Gas Implications of Changes in North Fork Valley, CO Coal Mining: A Critical Review of the Colorado Roadless Areas Rulemaking RDEIS (July 2011) ("Power Consulting Report"), attached as Exhibit 1 to WildEarth Guardians and Sierra Club Comments on Colorado Rule Revised Draft EIS, (Ex. 52) at 8, nn.21-23 & 26 (CRR-137587 at 137603).

[135]  Id. at 8.

purchasers would likely switch to Powder River Basin coal if they could not buy the

North Fork coal that the Rule would otherwise make accessible.[136]  Because mining

North Fork coal releases up to 90 times more methane per ton of coal mined than Powder

River Basin coal, a partial "substitution" by purchasers of Powder River coal for North

Fork coal they could not access would result "in significant reduction in emissions of

methane, a powerful [greenhouse gas]."[137]  Given available data on past mine emissions

and the detailed economic projections of future North Fork mining, see supra at 59, the

Forest Service could not reasonably conclude that the agency was unable to quantify or at

the very least, estimate, methane emissions for the various Colorado Rule alternatives.[138]

In short, the FEIS's rudimentary ranking of alternatives fails to provide any useful

information about greenhouse gas emissions caused by coal mining, and thus violates

---

[136] As discussed below, infra at 68, there would not be complete switching to Powder River basin coal because restricting mining opportunities in the North Fork under the national Roadless Area Conservation Rule would lead to lower overall coal consumption.  See also Power Consulting Report (Ex. 52) at 12-14 (CRR-137587 at CRR-137607-09).

[137]  Power Consulting Report (Ex. 52) at 4 (CRR-137587 at 137599); see also id. at 6-11 (CRR-137601-06).  For example, the Power Consulting Report concluded that, compared to Alternative 3 [Forest Plans] "the net $CO_2$ savings under Alternative 1 by mining Wyoming coal in place of North Fork coal is about 189 million tonnes."  Id. at 10 (CRR-137605).  While Dr. Power made this comparison between the two most different alternatives, this same analysis would appear to apply equally to a comparison of Alternatives 1 and 2.

[138] Indeed, in earlier litigation involving the West Elk mine, the Forest Service did just such an analysis, further evidence that they could and should have done the same here.  WildEarth Guardians, 828 F. Supp. 2d at 1231 (agency FEIS contained estimates of anticipated methane emissions based on existing data from established methane wells).

NEPA's "hard look" mandate as well as the regulations requiring complete disclosure of relevant information.[139]

In addition, the Colorado Rule FEIS's statement that it will conduct quantitative studies of air and greenhouse gas emissions later, at the site-specific level,[140] cannot substitute for the Forest Service's obligation to fully analyze environmental effects that are reasonably foreseeable now, when unlocking the coal for mining. As the Ninth Circuit explained:

> If an agency were able to defer analysis discuss[ing] … environmental consequences in [a programmatic EIS], based on a promise to perform a comparable analysis in connection with later site-specific projects, no environmental consequences would ever need to be addressed in an EIS at the [programmatic] level if comparable consequences might arise, but on a smaller scale, from a later site-specific action ….

Kern, 284 F.3d at 1072; see also id. at 1073 (finding programmatic EIS violated NEPA by failing to address an "environmental problem" that "was readily apparent at the time the EIS was prepared"). "NEPA is not designed to postpone analysis of an environmental consequence to the last possible moment. Rather, it is designed to require such analysis as soon as it can reasonably be done." Id. at 1072; see also Sierra Club v. U.S. Dep't of Energy, 255 F. Supp. 2d 1177, 1186 (D. Colo. 2002) (rejecting agency's

---

[139]  See supra at 49. Even if this Court finds that quantitative information concerning air and greenhouse gas pollution from prolonged coal mining under the Colorado Rule cannot reasonably be obtained, NEPA regulations still require the agency to make specific findings regarding any such incomplete or unavailable information. Here, the FEIS failed to include the disclosures enumerated in 40 C.F.R. § 1502.22(b) and must therefore be set aside.

[140]  See CRR FEIS (Ex. 27) at 129-30 (CRR-154023 at 154161-62).

63

argument that "its commitment to perform a NEPA review in the future obviates the need to perform a NEPA review at this time").  Likewise here, the Colorado Rule encompasses reasonably foreseeable increases in greenhouse gas pollution that must be fully analyzed.

**B.    The Colorado Rule FEIS Failed To Adequately Disclose Greenhouse Gas Pollution Released From Combustion Of North Fork Valley Coal.**

The North Fork Valley coal made accessible by the Colorado Rule is mined for one purpose only:  combustion.  Yet the Colorado Rule FEIS entirely ignored the foreseeable greenhouse gas pollution from burning the more than one-third of a billion tons of coal the Rule makes accessible.  The FEIS acknowledged that "[t]he combustion of coal also results in carbon dioxide emissions," but then declared that "emissions associated with combustion of coal are not considered in detail for the FEIS."[141]

In defense of this omission, the FEIS offered three unsupported statements:  First, it claimed that "[p]ower plants that burn coal have varying degrees of efficiency and potential emissions at the point of combustion is too speculative."[142]  Next, it stated that "[i]t is reasonable to expect wider adoption of more efficient technologies, such as carbon capture and storage, in the next few decades."[143]  And finally, the FEIS claimed that "any reduction in coal production associated with a roadless rule likely would be substituted

---

[141]  Id. at 138 (CRR-154170).

[142]  Id.

[143]  Id.

by coal from another source."[144]  The FEIS provided no citation, basis, or explanation for any of these assumptions and none withstand scrutiny.

First, the Colorado Rule FEIS's conclusion that it is "too speculative" to be able to evaluate coal combustion emissions conflicts with record evidence showing that federal agencies regularly estimate coal combustion emissions due to coal lease decisions.[145] Indeed, the Forest Service provided just such an estimate for the West Elk Lease Modifications.[146]  Given that Federal agencies – including the Forest Service – have made these calculations before, the Roadless FEIS's assertion that coal combustion impacts are too speculative to disclose is arbitrary and capricious.

The Forest Service's duty to estimate air pollution impacts from mining is further bolstered by caselaw that mandated that an agency disclose such impacts when evaluating an action that would make more coal available, as the Colorado Rule does, and thus make coal more attractive for utilities to burn.  In Mid States, the Surface Transportation Board approved a shorter rail line to deliver low-sulfur coal to power plants, but failed to consider the effects on air quality resulting from the increase in coal supply.  345 F.3d at

---

[144]  Id. at 139 (CRR-154171).

[145]  See Power Consulting Report (Ex. 52) at 21 (CRR-137587 at 137616) (noting "BLM … in its 2010 analysis of the West Antelope II coal leases in Wyoming, *did* estimate the likely emission of $CO_2$ and other GHGs from plants burning the coal from the mine" (citing Powder River Basin Resource Council, 180 IBLA 119, 132 (2010)) (emphasis in original)); see also WildEarth Guardians and Sierra Club Comments on Colorado Rule Revised Draft EIS (July 14, 2011) (Ex. 24) at 7-8 (CRR-133815 at 133821-22) (listing examples where "action agencies have disclosed the [greenhouse gas] impacts of coal combustion when considering actions that may facilitate coal mining").

[146]  See supra at 54; Lease Mods FEIS (Ex. 1) at 80 (FSLeasing-46776 at 46877).

532, 550. The rail company acknowledged that increased supply would drive new power plant construction and thus more coal combustion, but argued that the agency need not address the effects of increased coal generation because the location and specifications of any new plants was speculative. Id. at 549. The court rejected this argument, finding: "degradation in air quality, is indeed something that must be addressed in an EIS if it is 'reasonably foreseeable.'" Id. Even if the full extent of impacts may be unknown, the court stated that "when the nature of the effect is reasonably foreseeable but its extent is not, we think that the agency may not simply ignore the effect," but must instead make reasonable projections or explain why it could not pursuant to 40 C.F.R. § 1502.22. Id. Upon remand, the agency in Mid States completed an air quality impacts study using available computer models. See Mayo Found. v. Surface Transp. Bd., 472 F.3d 545, 555 (8th Cir. 2006).

Here, the nature of the effect – greenhouse gas pollution from coal combustion – is clearly foreseeable, even if the precise extent may require the agency to make projections. But the Colorado Rule FEIS entirely ignored this impact and failed to convey any meaningful information about the differences in air and greenhouse pollution from increased coal combustion – differences which are indeed real and capable of being estimated. Moreover, Mayo Foundation shows that, even a decade ago, a federal agency was able to conduct modeling that quantified increases in air pollutants, including carbon

66

dioxide, due to increased coal consumption, undercutting the Forest Service's conclusion here that such modeling was impossible.  See id. at 555.

Second, the argument that combustion-related greenhouse gas emissions can be ignored because technologies to mitigate these emissions might be implemented decades from now must also be rejected.  While the Forest Service may wish to incorporate projections regarding speculative, someday mitigation into its analysis, that is no reason to skip analysis altogether.  Regardless of what technological improvements develop in coming years, the Colorado Rule unlocked 347 million tons of coal that would otherwise have been left inaccessible.  And no amount of "more efficient technologies" can be blindly assumed to negate 100% of pollution from increased combustion.  An agency may not rely on future mitigation measures to avoid analyzing the impacts of an activity in an EIS.  See New York v. Nuclear Regulatory Comm'n, 681 F.3d 471, 478-79 (D.C. Cir. 2012) (agency's decision to ignore future impacts based only on finding "reasonable assurance" that the impacts could be avoided at that later time violated NEPA); see also Neighbors of Cuddy Mountain v. U.S. Forest Serv., 137 F.3d 1372, 1381 (9th Cir. 1998) (holding EIS discussion of mitigation inadequate in part because it was "not clear whether any mitigation measures would in fact be adopted").[147]  Likewise, the FEIS's

---

[147]  Further, an EIS must discuss "[m]itigation … in sufficient detail to ensure that environmental consequences have been fairly evaluated.'"  Robertson, 490 U.S. at 352.  "It is not enough to merely list possible mitigation measures."  Colo. Envtl. Coal., 185 F.3d at 1173.  Here, vague reference to "more efficient technologies, such as carbon capture and storage" – without reference to how efficient those technologies might be, and whether they have ever effectively

conclusion here that, "[i]t is reasonable to expect" future mitigation of carbon pollution, without more, is insufficient and cannot justify entirely dismissing these emissions.

Finally, the Colorado Rule FEIS's assumption that there will be no ultimate impact to greenhouse gas pollution because the same amount of coal will be burned whether or not the North Fork coal is mined finds no support in law or the record. The Eighth Circuit in Mid States rejected a nearly identical agency argument. There, the agency argued utilities would likely shift to low-sulfur coal even without the increased availability and lower price for coal made possible by a new rail line, and so the rail line would have no impact on pollution from coal combustion. 345 F.3d at 549. In other words, the agency asserted that it could ignore the most basic principle of supply and demand by assuming that increasing the supply of cheap coal would have no impact on the price of, and demand for, coal. The court rejected the proposition that "the demand for coal will be unaffected by an increase in availability and a decrease in price" and found it to be "illogical at best." Id. The court explained:

> The increased availability of inexpensive coal will at the very least make coal a more attractive option to future entrants into the utilities market when compared with other potential fuel sources, such as nuclear power, solar power, or natural gas. Even if this project will not affect the short-term demand for coal ... it will most assuredly affect the nation's long-term demand for coal as the comments to the DEIS explained.

Id. The court remanded for study of the effects of increased coal combustion.

---

reduced $CO_2$ emissions at coal-fired power plants – that may be adopted decades from now is the type of "mere listing" that courts have held violated NEPA.

68

Likewise, here, the Colorado Rule's decision making accessible an additional 347 million tons of North Fork Valley coal – coal that otherwise would have been inaccessible due to the national Roadless Area Conservation Rule – will increase the coal supply, reduce prices, and lead to increased coal consumption relative to the more restrictive national Rule.  Dr. Power's report explained that Forest Service "assumes that there are perfect substitutes for the coal coming from the roadless areas in the North Fork Valley that can be pursued at no additional cost by the existing customers for this coal."[148]  But "[f]acilitating the production of coal [by adopting the Colorado Rule] has an impact on greenhouse gas emissions because it encourages the burning of more coal than otherwise would have been burned because it makes it less costly to bring supply into balance with demand."[149]  By contrast, Dr. Power concluded that "the upward pressure that the reduction in mining of North Fork and other Colorado coal due to the adoption of a stricter roadless rule would put on coal costs faced by existing Colorado coal customers would lead to levels of coal consumption below those that otherwise would exist."[150]  Thus, restricting mining will lead to relatively higher prices, lower demand, and less combustion.

The Forest Service's contrary conclusion is arbitrary and capricious, given that there is no record evidence contrary to Dr. Power's report.  This is not a case where there

---

[148]   Power Consulting Report (Ex. 52) at 11-12 (CRR-137587 at 137606-07).

[149]   Id. at 14 (emphasis in original).

[150]   Id. (emphasis added).

is a "battle of the experts" between High Country Advocates and the Forest Service, because no evidence in the FEIS contradicts Dr. Power's analysis, nor did the Forest Service conduct its own analysis.  In short, "there is no analysis to defer to" here, so the FEIS must be set aside.  See Rocky Mountain Wild, 2013 WL 3233573, at *3 n.3.

### C.    The Colorado Rule FEIS Failed To Address, Acknowledge, Or Respond To An Expert Report On Greenhouse Gas Emissions.

In addition to failing to disclose complete information about greenhouse gas emissions, the FEIS's failure to acknowledge or respond to an expert report before it also renders the Colorado Rule FEIS inadequate under NEPA.

NEPA requires agencies to disclose, discuss, and respond to "any responsible opposing view," and provide their rationale for choosing one approach over the other. See 40 C.F.R. § 1502.9(b); see also supra at 37.  Here, the Power Report directly contradicted the FEIS's unsupported and cursory conclusion that if consumers were unable to access North Fork Valley coal production due to road construction restrictions, they would simply buy coal "from another source."[151]  To the contrary, Dr. Power's uncontroverted report demonstrated that limiting the accessibility of North Fork coal would limit supply, make purchasing substitute coal more expensive and thus reduce coal combustion.  See supra at 69.  The Colorado Rule FEIS nowhere acknowledged or responded to this expert opinion, or explained the agency's contrary conclusions.

---

[151]  See CRR FEIS (Ex. 27) at 138-39 (CRR-154023 at 154170-71).

70

Courts set aside action where, as here, agencies ignore contrary expert opinion. For example, in Center for Biological Diversity, numerous parties provided comments to the Forest Service that directly refuted the agency's finding on the habitat preferences of particular bird. 349 F.3d at 1167-68. The Ninth Circuit concluded the Forest Service's approach of simply noting in the record that opposing views existed, violated NEPA. "[NEPA's] regulations clearly state that the agency must disclose responsible opposing scientific opinion and indicate its response in the text of the final [environmental impact] statement itself. The mere presence of the information in the record alone does not cure the deficiency here." Id. at 1169 (internal citation omitted). Here, the Colorado Rule FEIS fails to address Dr. Power's report, or provide support for the agency's contrary conclusion. This was arbitrary and capricious and requires that the Colorado Rule's provision permitting road construction in the North Fork coal mining area be set aside.

## IV.    BLM'S APPROVAL OF THE EXPLORATION PLAN VIOLATES NEPA.

The Exploration Plan authorizes Arch Coal to scrape 10 drill pads and bulldoze 5.9 miles of new road into the Sunset Roadless Area, in some places less than a half-mile from the West Elk Wilderness. This construction will carve up forest habitat, degrade a roadless area, and cross or come within a few yards of identified hiking trails. But BLM's analysis failed to consider impacts to recreational use or to consider reasonable alternatives that could mitigate the environmental damage. For these reasons, the Exploration Plan decision violates NEPA and must be set aside.

71

A.      **BLM Violated NEPA By Failing To Take A Hard Look At The Exploration Plan's Impacts On Recreation.**

Despite the fact that the Exploration Plan approves road and pad construction, habitat destruction, and the scarring of hillsides within the Sunset Roadless Area, the EA failed to address project's impacts on the area's recreational use and users.

NEPA's "hard look" mandate applies to EAs as well as EISs, and courts do not hesitate to set aside agency action based on an EA's inadequate assessment of impacts. See Colo. Envtl. Coal. v. Office of Legacy Mgmt., 819 F. Supp. 2d 1193, 1207-11 (D. Colo. 2011), amended on reconsideration, 2012 WL 628547 (D. Colo. Feb. 27, 2012) (applying "hard look" requirement to EA and finding agency failed to disclose site-specific impacts of mining); Diné Citizens Against Ruining our Env't v. Klein, 747 F. Supp. 2d 1234, 1256-57, 1259 (D. Colo. 2010) (applying "hard look" requirement to an EA and setting it aside for failing to take a "hard look" at mitigation measures).[152]  "An environmental assessment that fails to address a significant environmental concern can hardly be deemed adequate for a reasoned determination that an EIS is not appropriate." Found. on Econ. Trends v. Heckler, 756 F.2d 143, 154 (D.C. Cir. 1985) (holding that "[i]n light of this complete failure to address a major environmental concern, [the agency's] environmental assessment utterly fails to meet the standard of environmental review necessary before an agency decides not to prepare an EIS.").  In addition, courts

---

[152]  See also Rocky Mountain Wild v. Vilsack, 843 F. Supp. 2d 1188, 1198-1200 (D. Colo. 2012) (applying "hard look" to an EA and finding agency analysis of impacts from logging project inadequate); Wilderness Soc'y v. Wisely, 524 F. Supp. 2d 1285, 1308 (D. Colo. 2007) (applying "hard look" requirement to an EA).

72

have specifically overturned NEPA analyses where the agency failed to take a hard look at impacts to recreational users.  See, e.g., Nat'l Parks & Conservation Ass'n v. Fed. Aviation Admin., 998 F.2d 1523, 1533 (10th Cir. 1993).[153]

In this case, BLM violated NEPA by explicitly declining to take any look, let alone the required "hard look," at the damage that the drill pads and roads proposed in the Exploration Plan will inflict on recreation values.  Instead, the EA simply declared that impacts to recreation "will not be analyzed."[154]  The agency admitted that recreation values are "Present" but concluded that there will be "No Impact" to such values because there are "no recreations [sic] facilities or areas within the analysis area."[155]

The EA's decision to "not … analyze[]" recreation impacts is arbitrary for three reasons.  First, the Lease Modification FEIS specifically postponed analysis of impacts on recreation until analysis of site-specific proposal, like the Exploration Plan.  Second,

---

[153]  See also San Luis Valley Ecosystem Council v. U.S. Forest Serv., No. 04-CV-01071 MSK, 2007 WL 1463855, at *9-*10 (D. Colo. May 17, 2007) (finding EA/FONSI violated NEPA "hard look" requirement in part because agency failed to address the significance of loss of recreational fishing opportunities).

[154]  Exploration Plan EA (Ex. 31) at 12-13 (BLM_EP-16168 at 16182-83). "Table 3 lists the elements considered in this section ....  Any element present, but not affected by the proposed action or no action alternative will not be analyzed in this document; the reasons for no impact will be stated." Id. at 12 (BLM_EP-16182).

[155]  Id. at 13 (Table 3 n.4) (BLM_EP-16183).  Despite its statement that the EA does not address impacts to recreation, the EA purports to address impacts to roadless characteristics, including impacts to "primitive, semi-primitive non-motorized and semi-primitive motorized classes of dispersed recreation." Id. at 16 (BLM_EP-16186).  This does not cure BLM's failure to take the required "hard look."  The EA's "analysis" of the impacts to roadless recreational values is 24 words long, and those few words do not address the potential for carving through the backcountry to degrade recreational enjoyment over the long term: "Temporary roads may increase foot access during the project (these roads would be closed to public motorized access). Roads will be reclaimed following use." Id.

73

the EA and the Lease Modifications FEIS acknowledge that the area is used by

recreationists.  And third, record evidence shows that construction for, and the

destruction left by, the Exploration Plan will degrade recreational experiences.

The Lease Modifications FEIS admitted that surface disturbing activities – like the

clear-cutting, road bulldozing, and drill pad clearing approved in the Exploration Plan –

could impact recreational uses of the area but postposed a hard look at such impacts.

Specifically, the FEIS stated:

> [the] presence of drill rigs and heavy equipment on the roads, and operating in the area could reduce a person's recreational experience.  As these activities would most likely occur during summer and into the fall months, they would be occurring in the time recreationists would most likely use the area.[156]

But while the FEIS thus admitted that construction of roads and drill pads could harm

recreational experiences, it explicitly deferred a detailed analysis of impacts to hiking,

camping, wildlife viewing, hunting, and other recreational uses until later, to the time

when a site-specific development activities on the leases were proposed:

> Site specific locations of potential surface activities are unknown[.]  Effects of post-leasing activities will be evaluated on their own merits if/when activities are specifically proposed.[157]

But when BLM later proposed such specific surface activities in the Exploration

Plan, the Agencies ignored their pledge – and duty – to take the required hard look at

---

[156] Lease Mods FEIS (Ex. 1) at 160-61 (BLM_EP-13386 at 13567-68; also available at FSLeasing-46776 at 46957-58).

[157] Id. (emphasis added).

those impacts.  Instead, the Exploration Plan EA simply declared that impacts to recreation "will not be analyzed."[158]  This kind of "shell game" – in which the agency postpones a hard look until the site-specific level and then, when the time comes, in fact takes no look – is impermissible.  It flouts NEPA's twin goals that agencies "consider every significant aspect of the environmental impact of a proposed action" and "inform the public that it has indeed considered environmental concerns in its decisionmaking process."  Los Alamos Study Grp. v. U.S. Dep't of Energy, 692 F.3d 1057, 1060 (10th Cir. 2012) (quoting Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 97 (1983)).

The Agencies' "shell game" is all the more arbitrary because prior to the Exploration Plan, the Agencies repeatedly acknowledged that visitors recreate in the exploration area.  For example, the Lease Modifications FEIS described "[d]ispersed recreation" in the area as including "camping, use of all-terrain vehicles (ATVs), and horseback riding on a limited basis….  A non-motorized non-system trail, the Sunset Trail, cuts through the lease modifications."[159]  The FEIS explained that the vicinity of the Lease Modifications area "is widely used for dispersed recreational activities, such as

---

[158]  Exploration Plan EA (Ex. 31) at 12-13 (BLM_EP-16168 at 16182-83).

[159]  Lease Mods FEIS (Ex. 1) at 49 (BLM_EP-13386 at 13456; also available at FSLeasing-46776 at 46846).  Because the Lease Modifications FEIS appears in the Exploration Plan administrative record, we provide the number for that record here.  However, we do not provide a redundant copy of the FEIS as an exhibit and have therefore included the corresponding number for the Forest Service Lease Modifications record as well.

hunting … hiking, biking[,] picnicking, horseback riding, … and sight-seeing."[160]  And although the FEIS characterized the Sunset Trail as "not get[ting] heavy use,"[161] this is precisely the appeal to the area's users, including High Country Advocates' members. Similarly, the Exploration Plan EA recognized that "[r]esidents and tourists visit the area for scenic and recreation values."[162]

The record also demonstrates the inaccuracy of the EA's basis for dismissing all impacts to recreation: the assumption that there are "no recreations [sic] facilities" in the exploration area.[163]  The EA itself mapped at least two trails within the area, most prominently the Sunset Trail after which the Exploration Plan is named.[164]  The construction of roads and drill pads on or directly adjacent to these trails clearly could harm the roadless area's visitors and their recreational enjoyment.  For example, the EA showed that the road to access one drill pad (SST-7) will be bulldozed across Sunset

---

[160]  Id. at 195 (BLM_EP-13602; also available at FSLeasing-46992) (emphasis added).

[161]  Id. at 158 (BLM_EP-13565; also available at FSLeasing-46955).  Other record evidence suggesting that the wilderness-capable portion of the Sunset Roadless Area "is heavily used during hunting season."  Sunset Roadless Evaluation (Appendix D), Lease Mods FEIS, id. at 479-80 (BLM_EP-13885-86; also available at FSLeasing-47275-76).

[162]  Exploration Plan EA (Ex. 31) at 31 (BLM_EP-16168 at 16201).  See also id. at 30 (BLM_EP-16200) (noting traffic on adjacent roads occurs "for recreational purposes"); id. at 9 (BLM_EP-16179) (identifying recreation as an "[o]n-going land use"); Arch Coal Exploration Plan (Ex. 29) at 50 (BLM_EP-25 at 74) (acknowledging "hunting and recreation" have historically occurred in the Exploration Plan area).

[163]  Exploration Plan EA (Ex. 31) at 13 (Table 3 n.4) (BLM_EP-16168 at 16183).

[164]  See id. at cover (BLM_EP-16168) (identifying project as "Sunset Trail Area Coal Exploration Plan"); id. at 5 (BLM_EP-16175) (map identifying trail in area as "Sunset Trail" and displaying another route as "Trail 8152" within the Sunset Roadless Area and Exploration Area). See also Arch Coal Exploration Plan (Ex. 29) at 71 (BLM_EP-25 at 95) (map identifying Sunset Trail and (unlabeled) Trail 8152).

76

Trail; another drill pad (SST-10) will be scraped less than 100 feet from Sunset Trail.[165]

An exploration drill pad (SST-1) will be built directly on top of Trail 8152, rendering any

use of that portion of the trail impossible while exploration occurs; and to the west, roads

will be constructed across and directly next to that same trail for about one-quarter

mile.[166]  In short, bulldozing for both drill pads and access roads will degrade the very

recreation facilities that BLM itself mapped in the exploration area.  And that harm will

continue long after the exploration is complete.  What was once a largely undisturbed and

pristine roadless area will be riddled with roads and drill pads, such that for years to

come, visitors seeking solitude will be unable to walk more than a few hundred yards in

any direction without encountering one of these intrusions.[167]

The Tenth Circuit has set aside similar agency action where the agency ignored

impacts to recreation.  In National Parks and Conservation Association, the Tenth Circuit

held that the FAA violated NEPA where the agency had "no empirical evidence to

support [its] claim" that approving a remote airport near a national park unit action

---

[165]  Exploration Plan EA (Ex. 31) at 5 (BLM_EP-16168 at 16175).

[166]  Id.  High Country Citizens raised these very concerns about the Exploration Plan's recreation impacts prior to the EA's publication.  High Country Citizens Exploration Plan Comments (Ex. 30) at 6 (BLM_EP-469 at 475) ("[c]onstruction associated with exploration is also likely to disturb recreation activities in the area," and describing road and drill pad encroachments on Sunset Trail and one other trail).

[167]  Even if there were no "developed recreation facilities" in the exploration area, that does not mean BLM can ignore foreseeable impacts to recreation.  Some recreationists – including Plaintiffs' members – seek out roadless areas precisely because they contain few developed facilities.  The Agencies specifically acknowledged that the general area "is widely used for dispersed recreational activities" that do not depend on constructed recreational facilities, but then ignored all impacts to such uses.  See supra at 75 (emphasis added).

"would have no significant impact on [visitors'] recreational use of the area."  998 F.2d at 1533.  Here, BLM similarly had "no empirical evidence" to support its claim of a lack of impact to recreational use, since it declined to address the issue at all.  To the contrary, record evidence documents recreation in the exploration area, and that the operation of heavy construction equipment and drill rigs will disturb forest visitors.  Long-term impacts of clear-cutting and bulldozing for road and drill pad construction will alter the recreational experiences visitor use.  BLM's decision to ignore these impacts is arbitrary and capricious.

Because the Exploration Plan EA failed to take any look at all, let alone the required "hard look" at impacts to recreation in the Sunset Roadless Area for the Exploration Plan, the agency violated NEPA.  Diné Citizens Against Ruining Our Env't, 747 F. Supp. 2d at 1248; see also Utah Envtl. Cong. v. Richmond, 483 F.3d 1127, 1134 (10th Cir. 2007) (agency action is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem") (quoting Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43).

**B.      BLM Violated NEPA By Failing To Consider A Range Of Reasonable Alternatives To The Proposed Exploration Plan.**

BLM's Exploration Plan EA also violates NEPA because the agency undertook only a truncated alternatives analysis, ignoring two alternatives proposed by High Country Advocates, as well as the agency's statutory mandate to consider conditions or modifications to exploration plans.  The proffered alternatives were viable, distinct, and

78

consistent with the agency's statutory authority and the project's objectives.  As such, NEPA mandated that BLM either analyze them or explicitly explain why the agency would not.  Because BLM did neither, the Exploration Plan must be set aside.

1.    Agencies Must Analyze A Range Of Alternatives In EAs.

In taking the "hard look" at impacts that NEPA requires, an EA must "study, develop, and describe" reasonable alternatives to the proposed action.  42 U.S.C. § 4332(2)(C) & (E); 40 C.F.R. § 1508.9(b) (an EA "[s]hall include brief discussions ... of alternatives").  "A properly-drafted EA must include a discussion of appropriate alternatives to the proposed project."  Davis, 302 F.3d at 1120 (granting injunction where EA failed to consider reasonable alternatives).  This alternatives analysis "is at the heart of the NEPA process, and is 'operative even if the agency finds no significant environmental impact.'"  Diné Citizens Against Ruining Our Env't, 747 F. Supp. 2d at 1254 (quoting Greater Yellowstone Coal. v. Flowers, 359 F.3d 1257, 1277 (10th Cir. 2004)).[168]  Reasonable alternatives must be analyzed for an EA even where a FONSI is issued because "nonsignificant impact does not equal no impact.  Thus, if an even less harmful alternative is feasible, it ought to be considered."  Ayers v. Espy, 873 F. Supp. 455, 473 (D. Colo. 1994) (internal citation omitted).  When BLM considers reasonable alternatives, it "ensures that it has considered all possible approaches to, and potential

---

[168]  See also W. Watersheds Project v. Abbey, 719 F.3d 1035, 1050 (9th Cir. 2013) (in preparing EA, "an agency must still give full and meaningful consideration to all reasonable alternatives" (emphasis added) (internal quotation and citation omitted)); 40 C.F.R. § 1502.14 (describing alternatives analysis as the "heart of the environmental impact statement").

environmental impacts of, a particular project; as a result, NEPA ensures that the most intelligent, optimally beneficial decision will ultimately be made." Wilderness Soc'y, 524 F. Supp. 2d at 1309 (quotations & citation omitted).

In determining whether an alternative is "reasonable," and thus requires detailed analysis, this Court looks to two guideposts: "First, when considering agency actions taken pursuant to a statute, an alternative is reasonable only if it falls within the agency's statutory mandate. Second, reasonableness is judged with reference to an agency's objectives for a particular project." Diné Citizens Against Ruining Our Env't, 747 F. Supp. 2d at 1255 (quoting New Mexico ex rel. Richardson, 565 F.3d at 709). Any alternative that is unreasonably excluded will invalidate the NEPA analysis. "The existence of a viable but unexamined alternative renders an alternatives analysis, and the EA which relies upon it, inadequate." Id. at 1256. The agency's obligation to consider reasonable alternatives applies to citizen-proposed alternatives. See Ctr. for Biological Diversity, 538 F.3d at 1217-19 (finding EA deficient, in part, for failing to evaluate a specific proposal submitted by petitioner).[169]

Finally, an agency must adequately and explicitly explain in the EA any decision to eliminate an alternative from further study. See Wilderness Soc'y, 524 F. Supp. 2d at 1309 (holding EA for agency decision to offer oil and gas leases violated NEPA because

---

[169] See also Colo. Envtl. Coal., 185 F.3d at 1171 (agency's "[h]ard look" analysis should utilize "public comment and the best available scientific information") (emphasis added).

it failed to discuss the reasons for eliminating a "no surface occupancy" alternative);

Ayers, 873 F. Supp. at 468, 473.

> 2.    The Exploration Plan EA Failed To Analyze A Range Of Reasonable Alternatives.

BLM's EA took an "all or nothing" approach to alternatives analysis, considering in detail only the "do nothing" alternative and Arch Coal's proposal, despite having authority to impose additional conditions. Specifically, BLM failed to analyze two citizen-proposed alternatives designed to reduce impacts to sensitive resources, or to explain why it need not analyze them, in violation of NEPA.[170]

High Country Advocates first proposed that BLM analyze an alternative to reduce road construction within the Roadless Area while allowing all ten of Arch's desired exploration holes to be drilled.[171] High Country Advocates noted that the Exploration Plan provides for redundant road access through the Roadless Area, unnecessarily increasing the damage that is likely to occur to the forest, wildlife, habitat, recreation and

---

[170] Exploration Plan EA (Ex. 31) at 4-10 (BLM_EP-16168 at 16174-80). BLM dismissed, without fully analyzing, two other alternatives suggested by High Country Citizens. Id. at 10 (BLM_EP-16180). These alternatives included (1) a proposal to use helicopter drilling rigs to avoid the construction of access roads and (2) a proposal to approve only the first year of work outlined in the Exploration Plan, i.e. four exploration holes, to allow Arch Coal to review that data before determining whether the remaining six exploration holes planned for 2014 needed to be drilled. Id. High Country Advocates does not contest BLM's summary dismissal of these potential alternatives.

[171] High Country Citizens Exploration Plan Comments (Ex. 30) at 8 (BLM_EP-469 at 477).

roadless values.[172]  High Country Advocates proposed that the agency analyze an alternative that would approve only one, but not both, of the alternate access routes.

High Country Advocates suggested a second alternative of allowing Arch Coal to drill all of its requested exploration holes except the most damaging single hole, SST-10, because: (1) SST-10 would be bulldozed in that part of the Sunset Roadless Area that the Forest Service in 2005 determined was the most wild, and was in fact capable of being designated as wilderness; (2) the access road to SST-10 cuts through mature spruce-fir forest (which will take many decades to regenerate); and (3) the drill pad would be built nearly on top of the Sunset Trail, and so would impact recreational values.[173]  This alternative would also eliminate the need for a half-mile of the proposed 5.9 miles of road, and two of seven stream crossings proposed in the plan.[174]  High Country Advocates noted that removing this single exploration pad and the road to access it "would have large benefits to other multiple uses of the land" while permitting Arch Coal to obtain 90% of its exploration data.[175]  These are exactly the kinds of trade-offs that NEPA requires agencies to explore.

---

[172]  Id.

[173]  See id.; Exploration Plan EA (Ex. 31) at 5 (BLM_EP-16168 at 16175) (Exploration EA map); Lease Mods FEIS (Ex. 1) at 169 (BLM_EP-13386 at 13576; also available at FSLeasing-46776 at 46966) (map showing Forest Service's 2005 roadless inventory and identifying wilderness capable lands of the Sunset Roadless Area).

[174]  See Exploration Plan EA (Ex. 31) at 5 (BLM_EP-16168 at 16175) (EA map).

[175]  High Country Citizens Exploration Plan Comments (Ex. 30) at 8 (BLM_EP-469 at 477).

Both of these proposed alternatives meet this Court's reasonableness test. First, both proposed alternatives fall within the agency's statutory mandate, which requires that BLM "[a]pprove, disapprove, approve upon condition(s), or require modification to exploration plans." 43 C.F.R. § 3480.0-6(d)(1) (emphasis added).[176] BLM thus has ample authority to explore more than the "all or nothing" approach it took here. Second, the proposed alternatives would meet the exploration plan's "purpose and need," which is to approve, disapprove, or "approve the plan with additional conditions … if needed to minimize impacts."[177] Both the statutory framework and the purpose and need thus anticipate alternatives that condition plan approval to reduce environmental harm. Yet BLM failed to examine approving the exploration plan with reasonable conditions.

BLM's alternatives analysis therefore violates NEPA in at least two ways. First, BLM failed to acknowledge the existence of, let alone explain its decision to not consider, High Country Advocates' reasonable reduced road and nine-drill hole alternatives. This Court has routinely set aside EAs where agencies fail to explicitly address or explain their decision to eliminate an alternative from study. See Wilderness Soc'y, 524 F. Supp. 2d at 1309 (setting aside BLM leasing decision where agency failed to "adequately explain why" it did not analyze a "no surface occupancy" drilling alternative); Ayers, 873 F. Supp. at 468, 473 (failure to discuss rejection of an otherwise

---

[176] See also 43 C.F.R. § 3482.2(a)(1) (authorized officer shall consult with surface management agency, and shall "approve or disapprove in writing an exploration plan," but in approving the plan "may impose additional conditions." (emphasis added)).

[177] Exploration Plan EA (Ex. 31) at 2 (BLM_EP-16168 at 16172).

83

reasonable alternative in the EA violated NEPA because the agency was required to disclose its reasoning).  The fact that these alternatives were proposed by the public does not lessen BLM's duty to consider them.  See Ctr. for Biological Diversity, 538 F.3d at 1217-19 (9th Cir. 2008); San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife Serv., 657 F. Supp. 2d 1233, 1247 (D. Colo. 2009) (granting preliminary injunction, finding that an agency's failure to consider citizen-proposed alternatives in its EA, including alternative drilling sites and methods, "may well have been arbitrary and capricious").  BLM thus cut out the "heart" of the NEPA process by failing to consider, or explain why it need not consider, these reasonable alternatives.

Second, this Court has set aside NEPA analysis where an agency has a statutory authority to consider approving an action with conditions, but fails to analyze any alternative between "all" and "nothing."  In Diné Citizens Against Ruining Our Environment, this Court held that the agency, the Office of Surface Mining (OSM), violated NEPA when it considered only two alternatives: the action and "no action" alternatives.  747 F. Supp. 2d at 1254-56.  While such a truncated "range" of alternatives might be reasonable based on the project's purpose and need, OSM's all-or-nothing analysis was not reasonable "in light of the scope of OSM's statutory authority."  Id. at 1255.  This Court noted that the OSM regulations at issue in Diné Citizens required "three possible courses of action" upon receiving a coal mine permit revision application – "approval, approval with conditions, and disapproval" – but that the EA failed to

examine approving the mine with conditions as envisioned by agency regulations.  Id.

Here, BLM's authority mirrors OSM's:  BLM may "[a]pprove, disapprove, approve upon

condition(s), or require modification to exploration plans." 43 C.F.R. § 3480.0-6(d)(1).

But BLM did here what OSM did in Diné Citizens and ignored its authority and duty to

consider approving an action with conditions.  Like the impermissibly narrow analysis in

Diné Citizens, given the scope of its authority, BLM's perfunctory analysis of only the

action and "no action" alternatives violated NEPA.  See 747 F. Supp. 2d at 1254-56.[178]

### CONCLUSION AND REQUEST FOR RELIEF

Under the APA, courts "shall ... hold unlawful and set aside agency action,

findings, and conclusions found to be ... arbitrary, capricious ... or otherwise not in

accordance with law."  5 U.S.C. § 706(2)(A) (emphasis added); see also Forest Guardians

v. Babbitt, 174 F.3d 1178, 1187-88 (10th Cir. 1999) (recognizing that as used in the

APA, "shall means shall").  Accordingly, the normal remedy under the APA is to vacate

unlawful agency action and remand to the agency to act in compliance with its legal

obligations.  See, e.g., Cal. Wilderness Coal. v. U.S. Dep't of Energy, 631 F.3d 1072,

1095 (9th Cir. 2011) ("When a court determines that an agency's action failed to follow

Congress's clear mandate the appropriate remedy is to vacate that action"); id. at 1106

---

[178] BLM's brief consideration and dismissal of High Country Advocates' other two proposals (i.e. use of helicopter drilling rigs and limiting exploration to only the four holes Arch Coal proposed for 2013, see supra at 81 n.170) does not alter this result.  Indeed, in Diné Citizens Against Ruining Our Environment, OSM had similarly "briefly considered but properly dismissed two statutorily required alternatives."  747 F. Supp. 2d at 1255 n.35.  This was still insufficient to discharge the agency's duty to evaluate a range of reasonable alternatives.  Id. at 1256.

(vacating agency action for NEPA violation); <u>Center for Native Ecosystems v. Salazar</u>, 795 F. Supp. 2d 1236, 1240 (D. Colo. 2011) ("when a rule has been found to be legally invalid, the ordinary result is vacatur"), <u>citing</u> <u>Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs</u>, 145 F.3d 1399, 1409 (D.C. Cir. 1998).

High Country Advocates respectfully requests that this court vacate and remand each of the agency decisions adopted in violation of NEPA, including: (1) the Forest Service's decision to consent to the Lease Modifications; (2) BLM's Lease Modifications; (3) the Colorado Roadless Rule provision permitting road construction "for coal exploration and/or coal-related surface activities …in the North Fork coal mining area," 36 C.F.R. § 294.43(c)(1)(ix); and (4) BLM's Sunset Exploration Plan Decision Record and FONSI.

If this Court sets aside the Colorado Roadless Rule or the Lease Modifications, it must also vacate the Sunset Exploration Plan because the Exploration Plan could not have been approved but for the other decisions.  BLM approved Arch Coal's exploration proposal subject to regulations that address exploration of lands <u>within</u> a coal lease. <u>See</u> 43 C.F.R. Part 3480.  Should the Court set aside the Lease Modifications, applicants may explore for coal on that <u>unleased</u> land only if they apply for an exploration license under a rule with additional requirements that permit others interested in mining to join in

86

sharing the costs of, and obtaining the results of, the exploration.  43 C.F.R. Part 3410.

See also supra at 5.  Neither BLM nor Arch Coal has complied with those regulations.[179]

In addition, the Exploration Plan approves road construction within the Sunset

Roadless Area, which is managed in accordance with the Colorado Rule.[180]  If the Rule's

North Fork exception is set aside, the Forest Service could not concur to, and BLM could

not approve, road construction for exploration in the Sunset Roadless Area.[181]

Finally, a decision that the Colorado Roadless Rule's North Fork coal mining area

exception is invalid would also require that the Lease Modifications be set aside.  The

Lease Modifications grant to Arch Coal the right to construct roads on lands added to the

lease.[182]  Absent the Colorado Roadless Rule North Fork coal mining area exception, the

Forest Service could not approve road construction within the Sunset Roadless Area.[183]

---

[179]  See also Third Amended Complaint ¶¶ 110-13 (Feb. 28, 2014) Dkt. #51.2 (alleging approval of coal exploration proposal without an exploration license violates BLM regulations).

[180]  Exploration Plan EA (Ex. 31) at 16 (BLM_EP-16168 at 16186).

[181]  See also Third Amended Complaint ¶¶ 106-09 (Feb. 28, 2014) Dkt. #51.2 (alleging approval of road construction in exploration plan violates Colorado Roadless Rule).

[182]  BLM, Modified Coal Lease, COC-1362 (Mar. 26, 2013) (Ex. 21) at 1, 9-10 (BLM_mods11064 at 11072-73); BLM, Modified Coal Lease, COC-67232 (Mar. 21, 2013) (Ex. 22) at 1, 8-9 (BLM_mods11074 at 11081-82).

[183]  See supra at 6 n.3.

Respectfully submitted March 20, 2014,

/s/ *Edward B. Zukoski*
Edward B. Zukoski
Jessica Townsend
Earthjustice
1400 Glenarm Place, Suite 300
Denver, CO 80202
(303) 623-9466
Fax: (303) 623-8083
tzukoski@earthjustice.org

Attorneys for High Country Conservation Advocates, WildEarth Guardians, and Sierra Club

**CERTIFICATE OF SERVICE**

I certify that on March 20, 2014, I filed the foregoing PLAINTIFFS' OPENING BRIEF ON THE MERITS and exhibits thereto with the Court's electronic filing system, thereby generating service upon the following counsel of record:

| | |
|---|---|
| David B. Glazer<br>U.S. Department of Justice-CA-San Francisco<br>Environment & Natural Resources Division<br>301 Howard Street<br>San Francisco, CA  94105<br>Phone:  (415) 744-6477<br>Fax:  (415) 744-6476<br>Email:  david.glazer@usdoj.gov<br><br>Attorney for Defendants United States Forest Service, Bureau of Land Management, United States Department of the Interior, Daniel Jirón, Scott Armentrout and Helen Hankins | Michael Robert Drysdale<br>Dorsey & Whitney, LLP-Minneapolis<br>50 South Sixth Street, #1500<br>Minneapolis, MN  55402-1498<br>Phone:  (612) 340-2600<br>Fax:  (612) 340-2868<br>Email:  drysdale.michael@dorsey.com<br><br>Attorney for Intervenor-Defendants Ark Land Company and Mountain Coal Company |
| Scott Pringle Sinor<br>Dorsey & Whitney, LLP-Denver<br>1400 Wewatta Street, #400<br>Denver, CO  80202-5549<br>Phone:  (303) 629-3400<br>Fax:  (303) 629-3450<br>Email:  sinor.scott@dorsey.com | John S. Most<br>Natural Resources Section<br>United States Department of Justice<br>601 D Street, N.W., Room 3536<br>P.O. Box 7611 Washington, D.C. 20044-7611<br>Tel:    (202) 616-3353<br>Fax:    (202) 305-0506 (fax)<br>Email: John.Most@usdoj.gov<br><br>Attorneys for Defendants United States Forest Service et al. |

 */s/ Edward B. Zukoski*

89

# INDEX OF EXHIBITS

| Exhibit # | Description | Administrative Record (AR) Pages |
|---|---|---|
| Exhibit 1A-1H | Forest Service, Federal Coal Lease Modifications COC-1362 and COC-67232 Final Environmental Impact Statement Vol. I (Aug. 2012) ("Lease Mods FEIS") | FSLeasing-46776 |
| Exhibit 2 | D. Gray, West Elk photos (July 9, 2012) (excerpts) | FSLeasing-116848 at 116876 |
| Exhibit 3 | Letter of E. Zukoski, Earthjustice to Forest Supervisor (July 9, 2012) ("High Country Citizens' Alliance Draft EIS Comments") (excludes exhibits) | FSLeasing-40703 at 40704 |
| Exhibit 4 | Ark Land Co., Application to Modify Federal Coal Leases C-1362 and COC-67232 (Jan. 16, 2009) | FSLeasing-8731 at 8734 |
| Exhibit 5 | U.S. Geologic Survey, Minnesota Pass Quadrangle (1979), attached as Ex. 24 to letter of E. Zukoski, Earthjustice to C. Richmond, Forest Service (May 10, 2010) | FSLeasing-111101 at 111102, 111517 |
| Exhibit 6 | Letter of A. Pfister, FWS to C. Richmond, GMUG NF (June 16, 2010) | FSLeasing-117713 |
| Exhibit 7 | Forest Service, Opportunity to Comment, Modifications to Federal Coal Leases COC-1362 and COC-67232 (Apr. 14, 2010) ("FS Scoping Notice") | FSLeasing-70123; BLM_mods-7 |
| Exhibit 8 | Forest Service, Environmental Assessment, Federal Coal Lease Modifications COC-1362 & COC-67232 (Nov. 2011) ("FS Lease Mods EA") (excerpts) | FSLeasing-41789 |
| Exhibit 9 | Forest Service, Decision Notice and Finding of No Significant Impact, Federal Coal Lease Modifications COC-1362 & COC-67232 (Nov. 8, 2011) ("Lease Mods FONSI") | FSLeasing-41611 |
| Exhibit 10 | WildEarth Guardians et al., Appellants' Statement Of Reasons And Request For Relief (Dec. 30, 2011) ("High Country Citizens' Alliance 2011 Forest Appeal") | FSLeasing-129803 |

| Exhibit 11 | Letter of B. Ferebee, Forest Service to E. Zukoski, Earthjustice (Feb. 13, 2012) | FSLeasing-131054 at 131056 |
|---|---|---|
| Exhibit 12 | Forest Service, Draft Environmental Impact Statement, Federal Coal Lease Modifications COC-1362 & COC-67232 (May 2012) ("Lease Mods Draft EIS") (excerpts) | FSLeasing-9871 |
| Exhibit 13 | BLM, Environmental Assessment, West Elk Coal Lease Modifications Application, DOI-BLM-CO-150-2012-13-EA (June 2012) ("BLM Preliminary EA") (excerpts) | BLM_mods-7213 |
| Exhibit 14 | Letter of E. Zukoski, Earthjustice to B. Sharrow, BLM (July 9, 2012) ("High Country Citizens' Alliance Preliminary EA Comments") | BLM_mods-161 |
| Exhibit 15 | Forest Service, Record of Decision, Federal Coal Lease Modifications COC-1362 & COC-67232 (Aug. 2, 2012) ("Forest Service Lease Mods ROD") | FSLeasing-69890 |
| Exhibit 16 | WildEarth Guardians et al., Appellants' Statement Of Reasons And Request For Relief (Sep. 24, 2012) ("High Country Citizens' Alliance 2012 Forest Appeal") (excludes exhibits) | FSLeasing-131215 at 131216 |
| Exhibit 17 | Letter of B. Ferebee, Forest Service to E. Zukowski [sic], Earthjustice (Nov. 7, 2012) | FSLeasing-65326 at 65327 |
| Exhibit 18 | Letter of T. McClure, Forest Service to K. Barton, BLM (Dec. 5, 2012) | FSLeasing-65402 at 65403 |
| Exhibit 19 | BLM, Record of Decision, Federal Coal Lease Modifications COC-1362 & COC-67232 (Dec. 27, 2012) ("BLM Lease Mods ROD") | BLM_mods-9817 |
| Exhibit 20A-20D | High Country Citizens' Alliance et al., Notice of Appeal and Petition for Stay (Jan. 28, 2013) (excludes exhibits) | BLM_mods-9853 |
| Exhibit 21 | BLM, Modified Coal Lease COC-1362 (Mar. 26, 2013) | BLM_mods-11064 |
| Exhibit 22 | BLM, Modified Coal Lease COC-67232 (Mar. 26, 2013) | BLM_mods-11074 |
| Exhibit 23 | Order, High Country Citizens' Alliance, et. al., IBLA-2013-78 (April 23, 2013) ("IBLA Order Dismissing Appeal") | BLM_mods-11061 |

2

| Exhibit 24 | Letter of E. Zukoski, Earthjustice to Colorado Roadless Rule/EIS (July 14, 2011) ("WildEarth Guardians and Sierra Club Comments on Colorado Rule Revised Draft EIS") (excludes exhibits) | CRR-133815 |
|---|---|---|
| Exhibit 25 | Letter of Rocky Smith, Rocky Mountain Wild et al. to Colorado Roadless Rule/EIS (July 13, 2011) | CRR-134856 at 135024 |
| Exhibit 26 | Letter of Matt Reed, High Country Citizens' Alliance to Colorado Roadless Rule/EIS (July 14, 2011) | CRR-135451 at 135465 |
| Exhibit 27 | Forest Service, Final Environmental Impact Statement, Rulemaking for Colorado Roadless Areas Vol. II (May 2012) ("CRR FEIS") | CRR-154023 |
| Exhibit 28 | Map 9, Rulemaking for Colorado Roadless Areas – North Fork Coal Mining Area: Alternatives 2 & 4 | CRR-154494 |
| Exhibit 29A-29C | Letter of W. Koontz, Ark Land Co. to C. Beecham, BLM (Mar. 21, 2013) ("Arch Coal Exploration Plan") | BLM_EP-25 at 26 |
| Exhibit 30 | Letter of E. Zukoski, Earthjustice to B. Sharrow, BLM (Apr. 19, 2013) ("High Country Citizens Exploration Plan Comments") (excludes exhibits) | BLM_EP-469 at 470 |
| Exhibit 31 | BLM, Environmental Assessment, Sunset Trail Area Coal Exploration Plan, DOI-BLM-CO-S050-2013-0027 EA (June 2013) ("Exploration Plan EA") | BLM_EP-16168 |
| Exhibit 32 | BLM, Finding of No Significant Impact, DOI-BLM-CO-S050-2013-0027 EA (June 27, 2013) | BLM_EP-16216 |
| Exhibit 33 | BLM, Decision Record, DOI-BLM-CO-S050-2013-0027 EA (June 27, 2013) | BLM_EP-16219 |
| Exhibit 34 | Letter of S. Armentrout, Forest Service to B. Sharrow, BLM (June 27, 2013) | BLM_EP-467 |
| Exhibit 35 | BLM's Motion to Docket Case And Make Decision Full Force And Effect, DOI-BLM-CO-S050-2013-0027 EA (July 1, 2013) | Dkt. #12.8 |
| Exhibit 36 | Declaration of Jeremy Nichols | |
| Exhibit 37 Exhibits 37A-D | Declaration of Allison N. Melton (with accompanying exhibits) | |

3

| Exhibit 38 | Declaration of Matt Reed | |
| Exhibit 39 | Letter of H. Whitman, Mount Gunnison Fuel Co. to Forest Supervisor (May 17, 2012) | FSLeasing-10246 |
| Exhibit 40 | Letter of H. Whitman, Mount Gunnison Fuel Co. to Forest Supervisor (June 26, 2012) | FSLeasing-36216 |
| Exhibit 41 | Arch Coal, "Projected and Maximum … Mine Layout" (2010) | FSLeasing-55539 |
| Exhibit 42 | Forest Service, "Subsidence Under Alternatives 2 and 3" (July 2012) | FSLeasing-55650 |
| Exhibit 43 | Email of J. Blakestad (April 04, 2012 3:57:30 PM) | FSLeasing-10208 |
| Exhibit 44 | Email of W. Koontz, West Elk Mine (April 23, 2012 4:16:30 PM) | FSLeasing-8787 |
| Exhibit 45 | Email of D. Garrison, U.S. Forest Service and attachment "BE supplement.docx" (July 13, 2012 2:36:05 PM) | FSLeasing-117760 at 117763 |
| Exhibit 46 | R. Taylor memo to file (July 16, 2012) | FSLeasing-55603 |
| Exhibit 47 | Interagency Working Group on Social Cost of Carbon, Technical Support Document (Feb. 2010) ("Interagency Working Group") | FSLeasing-41245 at 41403 |
| Exhibit 48 | Email of D. Epstein, Economist, BLM State Office to N. Mortenson, Forest Service | FSLeasing-116520 |
| Exhibit 49 | Email of C. Reed, Planning and Environmental Coordinator to N. Mortenson, Forest Service | FSLeasing-63963 |
| Exhibit 50 | Letter of J. Nichols, WildEarth Guardians (July 9, 2012) (excludes exhibits) | FSLeasing-40422 at 40423 |
| Exhibit 51 | Letter of R. Sweetwood, Mountain Coal Co. to D. Dyer, BLM (Dec. 30, 2010) | FSLeasing-139279 at 139280 |
| Exhibit 52 | J. Power, Greenhouse Gas Implications of Changes in North Fork Valley, CO Coal Mining: A Critical Review of the Colorado Roadless Areas Rulemaking RDEIS (July 2011) ("Power Consulting Report") | CRR-137587 at 137588 |

4